Phillip S. DAVI and Betty E. Davi, on behalf of themselves and all others similarly situated in the Western District of Virginia, Plaintiffs,

v.

Melvin LAIRD, Secretary, Department of Defense, Defendant.

No. 70–C–8–C.

United States District Court,
W. D. Virginia,
Abingdon Division.

Oct. 12, 1970.

F. Guthrie Gordon, Charlottesville, Va., for plaintiffs.

James G. Welsh, Asst. U. S. Atty., Roanoke, Va., for defendant.

WIDENER, District Judge.

This cause came to be heard before the court upon a motion by defendant to dismiss the complaint herein. Plaintiffs Davi, suing on behalf of themselves and others similarly situated, seek a declaration that defendant's conduct of the war in Vietnam and Southeast Asia is violative of the Constitution, and further request injunctive relief to prevent defendant's use of their taxes in furtherance of said activities. Jurisdiction is claimed under 28 U.S.C. §§ 1331(a), 2201 and 2284, application being made under the last-mentioned section for the impaneling of a three-judge district court.

As set forth in the complaint and in a memorandum of law filed with this court, plaintiffs' allegations challenge the constitutionality of United States military activity in Southeast Asia, absent a congressional declaration of war. Specifically, plaintiffs urge that defendant's acts in conducting such activity and in using congressional appropriations in furtherance thereof amount to an usurpation of legislative authority in violation of Art. I, § 8, cl. 11 of the Constitution, which grants to Congress the power to declare war. Plaintiffs further allege that such usurpation violates Art. VI, cl. 2 (the Constitution and laws made thereunder shall be the supreme law of the land), and clause three (executive officers shall be bound to support the Constitution). Finally, it is urged that the alleged illegal acts on the part of defendant deprive plaintiffs of liberty without due process of law, and violate their rights to a constitutional government and a "rule of law" guaranteed by the Ninth Amendment (rights enumerated in the Constitution shall not be construed to deny others retained by the people).

Although the issue presented is of first impression here, the constitutionality of our participation in the Vietnam war has been raised often of late. See Berk v. Laird, 429 F.2d 302 (2d Cir. 1970); Velvel v. Nixon, 415 F.2d 236 (10th Cir. 1969); Mora v. McNamara, 128 U.S.App.D.C. 297, 387 F.2d 862 (1967), cert denied, 389 U.S. 934, 88 S.Ct. 282, 19 L.Ed.2d 287; Luftig v. McNamara, 126 U.S.App.D.C. 4, 373 F.2d 664 (1967), cert. denied, 387 U.S. 945, 87 S.Ct. 2078, 18 L.Ed.2d 1332; Mottola v. Nixon, 318 F.Supp. 538 (N.D.Calif. 1970); Orlando v. Laird, 317 F.Supp. 1013 (E.D.N.Y.1970); United States v. Sisson, 294 F.Supp. 511 (D.Mass.1968). By its nature, the issue raises the gravest questions regarding the relationship between the judiciary and coordinate branches of government. In view of this, it is appropriate for this court to make a threshold inquiry into whether the issue involves a non-justiciable political question. To that end, this court is obliged to examine the question posed in terms of its historical management by the three branches of government and its susceptibility to judicial handling in light of its nature and posture in the instant controversy. See Baker v. Carr, 369 U.S. 186, 211, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

■ The power to commit American military forces under various sets of circumstances is shared by Congress and the Executive. Berk v. Laird, supra. The Constitutional expression of this arrangement was not agreed upon by the Framers without considerable debate and compromise.[1] A desire to facilitate the independent functioning of the Executive in foreign affairs and as commander-in-chief was tempered by a widely shared sentiment opposing the concentration of unchecked military power in the hands of the president. Thus, while the president was designated commander-in-chief of the armed forces, Congress was given the power to declare war. However, it would be shortsighted to view Art. I, § 8, cl. 11 as the only limitation upon the Executive's military powers. As plaintiffs' counsel correctly pointed out in oral presentation before this court, the Constitution provides a "delicate fabric" of checks and balances designed, in part, to restrain unilateral action by the Executive, but only under constitutional limitations. For example, it is evident that the Founding Fathers envisioned congressional power to raise and support military forces[2] as providing that body with an effective means of controlling presidential use thereof. *The Federalist* No. 26 (Hamilton). Specifically, the House of Representatives, where all revenue bills must originate, was viewed by the Framers as the bulwark against encroachment by the other branches. In *The Federalist* No. 58 (Hamilton or Madison), we find:

"The House of Representatives cannot only refuse, but they alone can propose, the supplies requisite for the support of government. They, in a word hold the purse—that powerful instrument by which we behold in the history of the British Constitution, an infant and humble representation of the people gradually enlarging the sphere of its activity and importance, and finally reducing, as far as it seems to have wished, all the overgrown prerogatives of the other branches of the government. This power over the purse may, in fact, be regarded as the most complete and effectual weapon with which any constitution can arm the immediate representatives of the people, for obtaining a redress of every grievance, and for carrying into effect every just and salutary measure."

Nor is Congress without other means of control. To an extent, it can restrict and qualify a president's conduct of foreign relations through resolution and other forms of legislation. If it so chooses, Congress may even resort to the drastic measure of impeachment.

Against this array of congressional checks upon presidential prerogative, the question arises, of what practical significance, by itself, is the power to declare war? It has been suggested that formal declarations of war belong to an earlier age and are seldom appropriate today. At the time the Constitution was drafted,

" * * * [W]ars * * * were rather formal affairs. Declarations were issued, troops were fitted out in ornate uniforms, battlefield formations were as stylized as a modern dance. One prepared for a war much as one prepared for an appearance at court." Sen. Peter H. Dominick, Senate Proceedings and Debates, 91st Congress, 2d Sess., 116 Cong.Rec. No. 83 (May 22, 1970).

As early as 1836, it was noted that formal declaration had fallen into disuse for hundreds of years before the American Revolution. See I Kent's Commentaries, at 53–54 (3d ed. 1836). Authoritative sources report that, since the Constitution was adopted, there have been as many as 125 instances of armed action

1. See Revely, "Presidential War-Making: Constitutional Prerogative or Usurpation," 55 Va.L.Rev. 1243, 1282, et seq. (1969); The Federalist, Nos. 26, 28, 48, and 58 (Cambridge Lib. Ed. 1901).

2. U.S.Const., Art. I, § 8, cl. 12.

initiated by American presidents without prior formal congressional declaration.[3]

Shortly after the Constitution was adopted, the Supreme Court found occasion to recognize that a state of hostilities might exist between the United States and another nation which Congress might authorize without a formal declaration of war. The Eliza, 4 Dall. 37, 1 L.Ed. 731 (1800). In *The Eliza*, Justice Washington drew a distinction between "solemn" and "imperfect" wars, and concluded that the war with France in 1799 was of the latter type. Noting that Congress had not formally declared war against France, he observed that "* * * [S]*uch a declaration by Congress might have constituted a perfect state of war, which was not intended by the government.*" [italics added] 4 Dall. at 40. In a separate opinion, Justice Patterson stated:

> "* * * An imperfect war, or a war, as to certain objects, and to a certain extent, exists between the two nations; and this modified warfare is authorized by the Constitutional authority of our country. It is war *quoad hoc. As far as Congress tolerated and authorized the war on our part, so far may we proceed in hostile operations.*" 4 Dall. at 45. [Italics added]

Given the intricate nature of international relations and contemporary diplomacy, there is a myriad of conceivable reasons why Congress might undertake a course of action which sanctions and implements executive action but which falls short of a formal declaration of war. For example, treaty rights may or may not be invoked on a formal declaration of war. And the question of whether congressional authorization to carry on certain hostilities has in fact been given is not readily answerable in terms of any particular provision of the Constitution. Rather, as noted hereinbefore, that document provides Congress with an array of powers which it may exercise to sanction or restrain executive action.

That Congress has participated actively with respect to the military effort in Vietnam is an established fact. See Orlando v. Laird, supra, 317 F.Supp. at 1018, 1019. It has repeatedly acted with reference to the Selective Service Act under which the expanded need for combat forces in Vietnam has been filled. It has appropriated more than 100 billion dollars in support of activities in Vietnam. Since 1964, the Southeast Asian conflict has been the subject of continuing debate on the floors of both Houses. In recent months, Congress has considered further specific measures in exercise of its constitutional prerogative.[5] On June 30, 1970, the Senate passed the Cooper-Church Amendment,[6] barring further funds for U. S. involvement in Cambodia. Senator Cooper, co-sponsor of the amendment, stated specifically that, by the measure, "* * * *we are asserting the constitutional authority of Congress.*" 116 Cong.Rec. at S9434 (June 22, 1970). On July 10, 1970, the Senate agreed to a joint resolution to terminate the Gulf of Tonkin Resolution, effective upon approval of both Houses. S.Con.Res. 64, 116 Cong.Rec. at S11054 (July 10, 1970). More recently, a measure popularly known as the "amendment to end the war" was defeated in the Senate. Whatever else may be gleaned from these measures and the debates surrounding them, it is at least abundantly clear that

---

3. Meeker, "Legality of U. S. Participation in Defense of Vietnam," Office of the Legal Adviser, Dept. of State (March 4, 1966); See also Chapman, "Armed Actions taken by the United States without a Declaration of War, 1789–1967," Historical Studies Division, Dept. of State (Sept. 13, 1967).

5. See, e. g., Proceedings and Debates of the 91st Congress, 2d Sess., 116 Cong.Rec. S9431–9497 (June 22, 1970); S9564–9565, S9586–9611 (June 23, 1970); S9654–9670, S9720–9727, S9733–9744 (June 24, 1970); S10258–10285 (June 30, 1970); H6513–6520 (July 9, 1970); S11018–11055 (July 10, 1970).

6. Senate Amendment to H.R. 15628, 116 Cong.Rec. S10275.

Congress is very aware both of its responsibilities regarding foreign policy and of the constitutional means afforded it to carry them out.

Notwithstanding these instances of congressional participation in determinations regarding the war in Vietnam, plaintiffs in the case at bar insist upon a finding of executive usurpation. They urge, in effect, that congressional participation, at least in this case, is constitutionally ineffective unless it takes the form of a declaration of war. Without such declaration, it is contended, the executive action in issue has exceeded that branch's legitimate authority.

■ While the question of whether executive action has been taken without constitutional authority has been held judicially cognizable, see, e. g., Youngstown Sheet and Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952); The Prize Cases, 67 U.S. (2 Black) 635, 17 L.Ed. 459 (1862), the issue of whether a certain instance of hostilities requires a formal declaration for its legitimation inescapably presents a political question. To so label plaintiffs' challenge is not a mere exercise in characterization, but rather a judicial recognition that the matter has been exclusively committed by the Constitution to the other coordinate branches of government. By their claim that the conflict in Vietnam is a form of war which may be prosecuted only under authority of formal congressional declaration, plaintiffs pose an issue which, in the opinion of this court, portrays the very substance of a nonjusticiable political question, as that doctrine is set forth in Baker v. Carr, supra.

Adjudication of plaintiffs' claim would require this court to make an initial policy determination of a kind clearly non-judicial in nature; that is, a judgment as to whether the war may be maintained in its present posture. Given Congress' discretion in the matter of whether a state of war should be declared and the myriad of reasons why that body might choose not to take such a step, any judicial determination that a certain state of hostilities is unauthorized absent such declaration would necessarily interfere with congressional prerogative. It would inevitably restrict Congress' constitutional authority to legitimize the carrying on of hostilities which fall short of a total, declared war. Resolution in favor of plaintiffs would admit of a judicial supervisory power over Congress' and the president's foreign policy-making authority by establishing a rule defining when, and if, a declaration is required.

There is a clearly demonstrable constitutional commitment of the issue raised by plaintiffs to the legislative branch. In their design of the "delicate fabric," the Framers gave *Congress*, not the courts, extensive controls over executive use of the military. So far as it was contemplated by the Framers, plaintiffs' remedy—indeed their only remedy—was to lie with their representatives in Congress. In fact, the question here posed, almost in its exact form, was discussed at length more than one hundred and eighty years before this case was decided. In *The Federalist,* No. 26 (Hamilton), we find:

"The idea of restraining the legislative authority, in the means of providing for the national defense, is one of those refinements which owe their origin to a zeal for liberty more ardent than enlightened. * * * [Most of the States] have refused to give it the least countenance; wisely judging that confidence must be placed somewhere; that the necessity of doing it, is implied in the very act of delegating power; and that it is better to hazard the abuse of that confidence than to embarrass the government and endanger the public safety by impolitic restrictions on the legislative authority.

* * * * * *

"The legislature of the United States will be obliged by this provision [Art. I, § 8, cl. 12], once at least in every two years, to deliberate upon the propriety of keeping a military force on foot; to come to a new resolution on the point; and to declare their

sense of the matter, by a formal vote in the face of their constituents. They are not at liberty to vest in the executive department permanent funds for the support of an army, if they were even incautious enough to be willing to repose in it so improper a confidence. As the spirit of party, in different degrees, must be expected to infect all political bodies, there will be, no doubt, persons in the national legislature willing enough to arraign the measures and criminate the views of the majority. The provision for the support of a military force will always be a favorite topic for declamation. As often as the question comes forward, the public attention will be roused and attracted to the subject, by the party in opposition; and if the majority should be really disposed to exceed the proper limits, the community will be warned of the danger, and will have an opportunity of taking measures to guard against it.

\*    \*    \*    \*    \*    \*

"It has been said that the provision which limits the appropriation of money for the support of an army to the period of two years would be unavailing, because the Executive, when once possessed of a force large enough to awe the people into submission, would find resources in that very force sufficient to enable him to dispense with supplies from the acts of the legislature. But the question again recurs, upon what pretense could he be put in possession of a force of that magnitude in time of peace? If we suppose it to have been created in consequence of some domestic insurrection or foreign war, then it becomes a case not within the principles of the objection; for this is levelled against the power of keeping up troops in time of peace. Few persons will be so visionary as seriously to contend that military forces ought not to be raised to quell a rebellion or resist an invasion; and if the defense of the community under such circumstances should make it necessary to have an army so numerous as to hazard its liberty, this is one of those calamities for which there is neither preventative nor cure. It cannot be provided against by any possible form of government; it might even result from a simple league offensive and defensive, if it should ever be necessary for the confederates or allies to form an army for common defense."

Plaintiffs do not allege, as they cannot, that Congress is without means to arrest the action complained of. Nor does it appear, as hereinbefore noted, that the legislative branch is unaware of or has abdicated its constitutional role in regard to the war. Instead, it is contended that the President and the Senate are "\* \* \* engaged in a struggle over the allocation of constitutional powers." One writer has aptly suggested that the constitutional grants of power to the legislative and executive branches, if taken literally and without limit, are "logical incompatibles" which indeed offer an "invitation to struggle for the privilege of directing foreign policy." *Revely*, supra n. 1, at 1247–48. Plaintiffs' request for relief has the effect of extending that invitation to this court. It must be declined. As Justice Jackson once observed,

> "Certainly it is not the function of the judiciary to entertain private litigation \* \* \* which challenges the legality, the wisdom, or the propriety of the Commander-in-Chief in sending our armed forces abroad or to any particular region." Johnson v. Eisentrager, 339 U.S. 763, 789, 70 S.Ct. 936, 949, 94 L.Ed. 1255 (1950).

To the extent that the present sharing of responsibility for the Vietnam conflict may be characterized as a struggle, it is clearly a result of the separation of powers, and is not subject to judicial interference.

In the face of overwhelming historical evidence that the legislature was not intended to be hampered by "impolitic restrictions," plaintiffs apparently urge

that Article I, § 8, cl. 3 be read as creating the exclusive procedure by which Americans may be drawn into foreign conflicts. From the proposition that Congress has the power to declare war, they conclude that an undeclared war is illegal. This escape from simple logic suggests only that clause 11 is not a repository of judicially manageable standards for resolving their claim, even if it were otherwise cognizable. In short, plaintiffs have failed to demonstrate that their claim may be extricated from the political question rule. It involves precisely that inquiry into principles and policy considerations which the Constitution has committed to the political branches, and with which the judiciary is ill-suited to cope.

The court is aware of the recent holding in Mottola v. Nixon, supra, to the effect that the constitutionality of the war in Vietnam presents a judicially cognizable issue. The court in *Mottola* apparently viewed the decision in Orlando v. Laird, supra, as reaching the merits of the same issue. This court does not attach such significance to *Orlando,* but rather reads that court's extensive discussion of congressional authorizations respecting the war only as providing further evidence that the issue involved is a political one, and that it has been submitted to the appropriate body. I am in positive disagreement with those parts of *Mottola* which allow judicial determination of the constitutional validity of the Vietnam war.

■ In its motion to dismiss, as amended, the Government raises other grounds, the merits of which need not be discussed. It should be noted, however, that sovereign immunity is generally not a bar to a suit by one injured by an act of a government official which is allegedly in excess of the latter's express or implied powers. Harmon v. Brucker, 355 U.S. 579, 581, 78 S.Ct. 433, 2 L.Ed.2d 503 (1958). The Government also contends that plaintiffs have no standing to bring this suit, relying on Velvel v. Nixon, supra. To substantiate their showing of a personal stake in the outcome of the suit, plaintiffs point out that they have acted as guardians of plaintiff Phillip Davi's younger brother, age 18, who "is now vulnerable to being drafted into said war." The complaint does not reveal whether the younger brother has in fact registered for the draft, whether he has been ordered to report for induction, or whether he was intended to be a member of the class on whose behalf the suit was brought. To the extent that it was brought for the benefit of the younger brother, it should be pointed out that the complaint does not show whether plaintiffs have been appointed the guardians of the younger brother. They do not sue in his name as next friends. F.R.Civ.P. 17(c).

To summarize. It is crystal clear that if there is one political question in the fabric of government of the Republic, it is whether or not to maintain a war, and if so, whether to maintain it as an imperfect or declared war. Into this seamless web of national and international politics, the courts should not intrude.

■ It appearing to the court, for the reasons stated herein, that the complaint does not state a substantial claim for injunctive relief, the convening of a three-judge court is not required. See Maryland Citizens for a Representative General Assembly v. Governor of Maryland, 429 F.2d 606 (4th Cir. 1970).

An order dismissing the complaint is this day entered.