**COMMONWEALTH OF MASSACHU-SETTS et al., Plaintiffs, Appellants,**

v.

**Melvin R. LAIRD, etc., Defendant, Appellee.**

**No. 71-1177.**

United States Court of Appeals, First Circuit.

Oct. 21, 1971.

Robert J. Condlin, Asst. Atty. Gen.,
with whom Robert H. Quinn, Atty. Gen.,
Walter H. Mayo, III, and Daniel J. John-

**28**

edis, Asst. Atty. Gen., were on brief, for appellants.

William A. Brown, Asst. U. S. Atty., with whom Herbert F. Travers, Jr., U. S. Atty., and James N. Gabriel, Asst. U. S. Atty., were on brief, for appellee.

David L. Norvell, Atty. Gen., State of New Mexico, on brief pro se, amicus curiae.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

COFFIN, Circuit Judge.

The question sought to be raised in this action is whether the United States involvement in Vietnam is unconstitutional, a war not having been declared or ratified by the Congress. Plaintiffs seek a declaration of unconstitutionality and an injunction against the Secretary of Defense barring further orders to duty in Southeast Asia of Massachusetts inhabitants if within ninety days of a decree the Congress has not declared war or otherwise authorized United States participation.

The individual plaintiffs are residents of Massachusetts and members of the United States forces who are either serving in Southeast Asia or are subject to such service. They allege that their forced service in an undeclared war is a deprivation of liberty in violation of the due process clause of the Fifth Amendment. The Commonwealth of Massachusetts is a plaintiff pursuant to an act of its legislature proscribing military service by its inhabitants in the conduct of extra-territorial non-emergency armed hostilities in the absence of a Congressional declaration of war and directing its Attorney General to bring an action in the Supreme Court or, in the event of a final determination that such action is not one of which that Court has original jurisdiction,[1] an action in an inferior federal court to defend the rights of its inhabitants and of the Commonwealth. M.G.L.A. c. 33 app., § 26–1.

The complaint, alleging active engagement by the United States in Indochina in armed hostilities "for the last six years," traces the familiar and unhappy history of escalation since 1950: assistance to the French, the first American casualties in 1959, the accumulation of 23,000 "military advisors" by 1964, the Gulf of Tonkin Resolution in the same year, and the subsequent exponential increase in air strike sorties, troops, casualties, and expenditures. The complaint repeatedly alleges the absence of a Congressional declaration of war or ratification. The Commonwealth alleges damage both as a sovereign state and as *parens patriae,* citing the deaths and injuries of its inhabitants, consequential loss of their prospective civic and tax contributions, increased claims of dependents, additional burdens on its economy, disadvantage to its absentee voters, mass demonstrations, and damage to its public's morale. It also asserts its interest in "maintaining the integrity of the Constitution" which is allegedly impaired in that "one branch, the executive, has exercised war-making powers, which the Commonwealth and its sister states had agreed would be exercised only by Congress."

The district court dismissed the complaint, relying on the alternate grounds that the controversy was not justiciable and that, if justiciable, continual Congressional legislation in support of the Vietnam war implied sufficient authorization. 327 F.Supp. 378 (D.Mass.1971).

As to threshold matters, we reject respondent's claim that subject matter jurisdiction is lacking. As we understand the argument, it is partly a restatement of arguments against justiciability.

[1] The Supreme Court denied leave to file a similar complaint, Justice Douglas contending in dissent that Massachusetts had standing and that the matter was justiciable. Massachusetts v. Laird, 400 U.S. 886, 91 S.Ct. 128, 27 L.Ed.2d 130 (1970). Since the disposition does not purport to decide the case, it technically does not qualify as a "final determination" as required by the Massachusetts statute. We do not deem this fact relevant to the proceedings before us.

What remains is the contention that, since the substantiality of plaintiffs' constitutional claims is challenged, there is lack of subject matter jurisdiction, citing Powell v. McCormack, 395 U.S. 486, 514 n. 37, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969). No such doctrine can be drawn from *Powell*; the contrary was made clear in Baker v. Carr, 369 U.S. 186, 199, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), i. e., that only if a claim is absolutely devoid of merit or frivolous could dismissal for lack of jurisdiction be justified. Nor do we find any merit in the claim that the individual plaintiffs, particularly those serving in Southeast Asia, lack standing. Berk v. Laird, 429 F.2d 302 (2d Cir. 1970).

We do not see, however, that Massachusetts achieves any special status as a protector of the rights of its citizens, solely as United States citizens, and not as a sovereign with unique interests. South Carolina v. Katzenbach, 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966).

*See also*, Note, The Supreme Court as Arbitrator in the Conflict Between Presidential and Congressional War-Making Powers, 50 B.U.L.Rev. 78, 79 n. 9 (Special Issue 1970). The traditional rationale is that the federal government is "the ultimate *parens patriae* of every American citizen," 383 U.S. at 324, 86 S. Ct. at 816. This admittedly seems inappropriate in a suit challenging the constitutionality of a war waged by the putative *parens*. Suffice it to say that some of the plaintiffs are properly before us.

While the challenge to the constitutionality of our participation in the Vietnam war is a large question, so also is the question whether such an issue is given to the courts to decide, under the circumstances of this case. The Supreme Court has thus far not ruled on the latter issue in this context. Other federal courts have differed in their rationales.[2] Scholars have probed "the political question" and have found it just as much an impenetrable thicket as have the courts.[3]

2. The spectrum of analysis is indicated by the positions taken vis-a-vis the "political question" in the following cases: Luftig v. McNamara, 126 U.S.App.D.C. 4, 373 F.2d 664, 666, cert. denied, 387 U.S. 945, 87 S.Ct. 207, 18 L.Ed.2d 1332 (1967)— "plainly the exclusive province of Congress and the Executive"; United States v. Sisson, 294 F.Supp. 511 (D.Mass. 1968)—evidence, policy considerations, and constitutional principles beyond normal judicial expertise; Velvel v. Johnson, 287 F.Supp. 846 (D.Kan. 1968)—activities of government "under the direction of the President, fall within the political question", 287 F.Supp. at 850; also, committed to both branches, *id.* at 852; also, "decisions of basic national policy, as of foreign policy, present no judicially cognizable issue", *id.* at 853; Davi v. Laird, 318 F.Supp. 478 (W.D.Va.1970), "clearly demonstrat[e] constitutional commitment * * * to the legislative branch", *id.* at 482, and to the other "political branches", *id.* at 484; Berk v. Laird [I], 317 F.Supp. 715 (E.D.N.Y. 1970) (unreported)—issue committed to Commander-in-Chief; Berk v. Laird [II], 429 F.2d 302 (2d Cir. 1970)—orders to fight are generally justiciable, the judicially discoverable standard being some mutual participation of Congress and the executive, but would be political question if standards lacking to judge adequacy of participation; Berk v. Laird [III], 317 F.Supp. 715 (E.D.N.Y.1970)—"Congressional authorization here is sufficiently 'explicit' to satisfy constitutional requirements", *id.* at 730, but method of authorization is a political question; Orlando v. Laird [I], 317 F.Supp. 1013 (E.D.N.Y.1970)—"reality of the collaborative action * * * required by the Constitution has been present", *id.* at 1019; Orlando v. Laird [II], 443 F.2d 1039 (2d Cir. April 20, 1971), cert. denied, October 12, 1971, 92 S.Ct. 94 —standard is some mutual participation, sufficiency of participation is not foreclosed by political question doctrine, but choice in form between a Congressional declaration and war-supporting legislation is a political question, courts having no standards by which to judge. *Contra* Mottola v. Nixon, 318 F.Supp. 538 (N.D. Cal.1970)—this is an issue of "plain constitutional interpretation", *id.* at 551, from which courts ought not "shy away on 'political question' grounds", *id.* at 550.

3. For overview, see Note, The Supreme Court as Arbitrator in the Conflict Between Presidential and Congressional War-Making Powers, 50 B.U.L.Rev. 78, 83–84 (Special Issue 1970). For analysis

In our own search for a principled resolution of the question of the appropriateness of our deciding the merits, we seek first to understand the theory of the complaint, then to identify the appropriate legal standard, and finally to apply that standard to the issue raised.

■ The Massachusetts statute, pursuant to which plaintiffs bring this action, is based on the simple proposition that participation by the United States in hostilities other than an emergency is unconstitutional unless "initially authorized or subsequently ratified by a congressional declaration of war according to the constitutionally established procedures in Article 1, Section 8 [Clause 11th], of the Constitution." [4] M.G.L.A. c. 33 app., § 26–1. The complaint expands this theory by recognizing that constitutionality could be achieved by a "constitutional equivalent" for a declaration of war or by specific ratification of executive actions.

In any event, despite some language charging the executive with exercising the "war-making powers" of Congress, the thrust of the complaint is not that the executive has usurped a power—the power to declare war—given to Congress. There is no claim that the executive has made any declaration. The charge is, rather, that since hostilities have long since transcended a response to an emergency, both Congress and the executive have acted unconstitutionally in sustaining the hostilities without a Congressional declaration of war. In effect the relief sought by the complaint is to order the executive to "get out or get a declaration from Congress."

■ Plaintiffs have understandably devoted considerable attention to the criteria of justiciability catalogued in Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691 (1962).[5] In assessing what have been termed the "prudential" and "functional" factors,[6] they assert that there are judicially discoverable standards for determining whether hostilities in Vietnam require a declaration of war; that no nonjudicial policy determination is required—only a determination of authority; that no lack of respect to coordinate branches will be shown, but, rather, respect for the Constitution; that circumstances do not require unquestioning adherence to a political decision already made; and that, with a court acting as final arbiter, there is no risk of embarrassment from multifarious pronouncements.

We are not so sanguine that these factors can be so easily disposed of. Per-

---

in terms of "classical", "prudential", and "functional" views, see Scharpf, Judicial Review and the Political Question: A Functional Analysis, 75 Yale L.J. 517 (1966). For an exposition of the "classical" view, see Wechsler, Toward Neutral Principles of Constitutional Law, 73 Harv.L.Rev. 1 (1959) and for critical comment on Powell v. McCormack, 395 U.S. 486, 89 S.Ct. 1944 (1969), see Note, The Supreme Court, 1968 Term, 83 Harv. L.Rev. 1, 62–77 (1969). See generally, Monaghan, Presidential War-Making, 50 B.U.L.Rev. 19 (Special Issue 1970); Note, Congress, The President, and The Power to Commit Forces to Combat, 81 Harv.L.Rev. 1771 (1968); Velvel, Undeclared War and Civil Disobedience (1970).

4. "The Congress shall have Power * * * to declare War, grant Letters of Marque and Reprisal, and make Rules concerning Captures on Land and Water . . . ."

5. Those factors were "a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question." 369 U.S. at 217, 82 S.Ct. at 710.

6. See Scharpf, n. 3, supra.

haps they impose no insuperable obstacle to principled decision in the case of long-continued, large-scale hostilities. But, once given the principle that a plaintiff may challenge the constitutionality of undeclared military operations, a court must be prepared to adjudicate whether actions are justified as emergency ones needing no declaration, or have gone beyond this bound. In the latter event the court must adjudicate whether Congress has expressly or impliedly ratified them. Workable standards, fact finding, the prospect of conflicting inferior court decisions, and other factors might well give pause to the most intrepid court.

We do not, however, rely on these factors. Partly we feel that to base abstinence on such pragmatic, if realistic, considerations is not desirable unless so clearly dictated by circumstances that it cannot be mistaken as abdication. Moreover, on a question so dominant in the minds of so many, we deem it important to rule as a matter of constitutional interpretation if at all possible. Finally, and of course most pertinently, we derive recent guidance from the Supreme Court's approach in Powell v. McCormack, 395 U.S. 486, 89 S.Ct. 1944 (1969), giving dominant consideration to the first decisional factor listed in Baker v. Carr, *supra.* This is the inquiry "whether there is a 'textually demonstrable constitutional commitment of the issue to a coordinate political department' of government and what is the scope of such commitment." 395 U.S. at 521, 89 S.Ct. at 1964.

To this critical factor of textual commitment, plaintiffs devoted one paragraph of their lengthy brief. They construed the issue as "judicial assessment of executive action in Vietnam against a constitutional standard." So phrased, the issue is of course, by definition, committed to the judiciary. Were the issue to be so defined, the Court in Powell v. McCormack, *supra,* would have spared itself much difficulty by stating simply that the issue was "judicial assessment of the action of the House in expelling a member against a constitutional standard." [7] In short, to any issue of challenged authority could be affixed the phrase "judicial assessment", and, by the affixing, the criterion of textual commitment eradicated. While the Court in *Powell* finally was able to pose the issue before it in substantially similar terms, it was only after a very lengthy discussion concluding that there had been no textual commitment of the unlimited power of expulsion to the House, and that none of the other factors of nonjusticiability listed in Baker v. Carr, *supra,* applied.

These observations do not spare us the task of trying to identify the scope of the power which has been committed to a coordinate branch in this case. The complaint at one point alleges that the executive has usurped the war-making power of Congress but more generally alleges that the executive errs only in proceeding to make war without Congressional declaration or ratification. This very ambiguity underscores the fact that the war power of the country is an amalgam of powers, some distinct and others less sharply limned. In certain respects, the executive and the Congress may act independently. The Congress may without executive cooperation declare war, thus triggering treaty obligations and domestic emergency powers. The executive may without Congressional participation repel attack,[8] perhaps catapulting the country into a major conflict. But beyond these independent powers, each of which has its own rationale, the Constitutional scheme envisages the joint participation of the Congress and

---

7. Similarly, the plaintiffs' theory does not account for the failure of the Court in Luther v. Borden, 48 U.S. (7 How.) 1, 12 L.Ed. 581 (1849) to pose the issue as "judicial assessment, against a constitutional standard, of failure of Congress to guarantee a republican form of government."

8. 2 Farrand, The Records of the Federal Convention of 1787, 318 (1911).

the executive in determining the scale and duration of hostilities. To Congress is granted the power to appropriate funds for sustaining armies. Article I, Section 8, Clause 12th. An analogous power given to the President is his power as Commander-in-Chief to station forces abroad. Article II, Section 2. Johnson v. Eisentrager, 339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255 (1950). Congress has the power to concur in or to counter the President's actions by its exclusive authority to appropriate monies in support of an army, navy and air force, Article I, Section 8, Clause 12th,[9] and by granting letters of marque and reprisal. Article I, Section 8, Clause 11th.

While the fact of shared war-making powers is clearly established by the Constitution, however, and some of its elements are indicated, a number of relevant specifics are missing. The Constitution does not contain an explicit provision to indicate whether these interdependent powers can properly be employed to sustain hostilities in the absence of a Congressional declaration of war. Hence this case.

The brief debate of the Founding Fathers sheds no light on this.[10] All we can observe, after almost two centuries, is that the extreme supporters of each branch lost; Congress did not receive the power to "make war"; the executive was given the power to repel attacks and conduct operations; the Congress was given the power to "declare" war—and nothing was said about undeclared hostilities.

Under these circumstances, what can we say was "textually committed" to the Congress or to the executive? Strictly speaking, we lack the text. Yet if "[d]eciding whether a matter has in any measure been committed by the Constitution to another branch of government, or whether the action of that branch exceeds whatever authority has been committed, is itself a delicate exercise in constitutional interpretation", Baker v. Carr, supra, 369 U.S. at 211, 82 S.Ct. at 706, surely our task is more than parsing. We must have some license to construe the sense of the Constitutional framework, wholly apart from any doctrine of implied powers inherent in sovereignty, cf. United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 315–318, 57 S. Ct. 216, 81 L.Ed. 255 (1936).

We observe, first, that the Founders' silence on the subject of hostilities beyond repelling attack and without a dec-

9. See also Note, The Appropriations Power as a Tool of Congressional Foreign Policy Making, 50 B.U.L.Rev. 34 (Special Issue 1970). .

10. It was, from the skeletal report in Farrand [(2 Farrand, 318–319)], less than encyclopedic in its coverage. The sequence of deliberations was as follows: (1) the draft constitutional provision, allowing the Congress "to make war" was moved; (2) Pinkney opposed, saying the Senate was better suited for expedition and wisdom than both houses jointly; (3) Butler, for the same reasons, thought the power should be in the President; (4) then Madison and Gerry moved to change "make" to "declare", "leaving to the Executive the power to repel sudden attacks"; (5) Sharman [sic] thought the existing wording "stood very well" permitting the executive "to repel and not to commence war" and feeling that "declare" would "narrow" the power given to Congress; (6) Gerry interjected that he "never expected to hear in a republic a motion to empower the Executive alone to declare war"; (7) Elseworth [sic] said it should be more easy to get out of war than into it—but added that war "is a simple and overt declaration. peace attended with intricate & secret negotiations"; (8) Mason was against giving the power of war to the Executive or to the Senate; he was "for clogging rather than facilitating war; but for facilitating peace". 2 Farrand 318–319. The Journal records a first vote of 5 to 4 against changing "make" to "declare" and a second vote of 8 to 1 for making the change. 2 Farrand 313. One member was persuaded to vote for the change by the argument that "make" might be understood to mean "conduct", which was an executive function. Butler then moved to give Congress the power "to make peace"; this failed 10–0. 2 Farrand 319.

laration of war was not because the phenomenon was unknown. In The Federalist No. 25, Hamilton, in opposing a proposed prohibition on raising armies in time of peace, described the effect of such a prohibition in these words: "As the ceremony of a formal denunciation of war has of late fallen into disuse, the presence of an enemy within our territories must be waited for, as the legal warrant to the government to begin its levies of men. * * *" The Federalist No. 25, at 156 (Mod. Lib. ed.) (Hamilton).

Secondly, we note that the Congressional power to declare war implies a negative: no one else has that power. But is the more general negative implied —that Congress has no power to support a state of belligerency beyond repelling attack and short of a declared war? The drafters of the Constitution, who were not inept, did not say, "power to commence war". Nor did they say, "No war shall be engaged in without a declaration by Congress unless the country is 'actually invaded, or in such imminent Danger as will not admit of delay.'" (Language from Article I, Section 10, proscribing states from engaging in war.) Nor did they resort to other uses of the negative as they so often did elsewhere. See, e. g., Article I, Section 9. And the "declare" power was not, like the "judge" power of the House of Representatives, Article I, Section 5, in a context limited by another specific provision, such as that specifying the three qualifications of a Representative. See Powell v. McCormack, supra.

Finally, we give some significance to the fact that in the same "power to declare war clause", Article I, Section 8, Clause 11th, there is the power to grant letters of marque and reprisal. Were this a power attendant to and dependent upon a declared war, there would be no reason to specify it separately. Indeed, it was first broached by Gerry as a matter not included in the "declare" power. 2 Farrand 326. Nevertheless, this is a power to be invoked only against an enemy. It is clear that there can be an "enemy", even though our country is not in a declared war. Bas v. Tingy, 4 U.S. (4 Dall.) 37, 1 L.Ed. 731 (1800).[11] The hostilities against France in 1799 were obviously not confined to repelling attack. This was an authorized but undeclared state of warfare. See also, Prize Cases (The Amy Warwick), 67 U. S. (2 Black) 635, 17 L.Ed. 459 (1862).

As to the power to conduct undeclared hostilities beyond emergency defense, then, we are inclined to believe that the Constitution, in giving some essential powers to Congress and others to the executive, committed the matter to both branches, whose joint concord precludes the judiciary from measuring a specific executive action against any specific clause in isolation. Cf. Oetjen v. Central Leather Co., 246 U.S. 297, 302, 38 S.Ct. 309, 62 L.Ed. 726 (1918).[12] In arriving at this conclusion we are aware that while we have addressed the problem of justiciability in the light of the textual commitment criterion, we have also addressed the merits of the constitutional issue. We think, however, that this is

11. Justice Washington stated that "If [a war] be declared in form, it is called solemn, and is of the perfect kind. * * *" but that "hostilities may subsist between two nations, more confined in its nature and extent being limited to places, persons and things; and this is more properly termed imperfect war. * * *" 4 U.S. (4 Dall.) at 40.

12. "The conduct of the foreign relations of our government is committed by the Constitution to the executive and legislative— 'the political'—departments of the government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision." 246 U.S. at 302, 38 S.Ct. at 311. Cf. Hamilton v. Dillin, 88 U.S. (21 Wall.) 73, 22 L.Ed. 528 (1874). "[W]hatever view may be taken as to the precise boundary between the legislative and executive powers in reference to [trade with the Confederacy during wartime] there is no doubt that a concurrence of both affords ample foundation for any regulations on the subject." 88 U.S. (21 Wall.) at 88.

inherent when the constitutional issue is posed in terms of scope of authority.

In the circumstance where powers are interrelated, Mr. Justice Jackson has said that:

"When the President acts in absence of either a congressional grant or denial of authority, he can only rely upon his own independent powers, but there is a zone of twilight in which he and Congress may have concurrent authority, or in which its distribution is uncertain. Therefore, congressional inertia, indifference or quiescence may sometimes, at least as a practical matter, enable, if not invite, measures on independent presidential responsibility. In this area, any actual test of power is likely to depend on the imperatives of events and contemporary imponderables rather than on abstract theories of law." Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 637, 72 S.Ct. 863, 871, 96 L.Ed. 1153 (1952) (concurring opinion).

We need not go so far as to say that in a situation of shared powers, the executive acting and the Congress silent, no constitutional issue arises. Here the complaint itself alleges the escalation of expenditures supporting United States efforts in Vietnam from $1.7 billion in 1965 to over $30 billion annually today, and a total expenditure over the past decade of $110 billion. Whether or not such appropriating and other actions of the Congress during the past six years can be said to amount to an "equivalent" of a declaration, or express or implied ratification is an issue we do not reach. At the very least, the complaint reveals a prolonged period of Congressional support of executive activities.

The question remains to be asked: when the executive and Congress disagree not as to the advisability of fighting a war but as to the appropriate level of fighting, how shall the Constitution be served? When the executive takes a strong hand, Congress has no lack of corrective power. Congress has the power to tax, to appropriate, to impound, to override a veto. The executive has only the inherent power to propose and to implement, and the formal power to veto. The objective of the drafters of the Constitution was to give each branch "constitutional arms for its own defense". The Federalist No. 23, at 476 (Mod. Lib. ed.) (Hamilton). But the advantage was given the Congress, Hamilton noting the "superior weight and influence of the legislative body in a free government, and the hazard to the Executive in a trial of strength with that body." Id. at 478.

All we hold here is that in a situation of prolonged but undeclared hostilities, where the executive continues to act not only in the absence of any conflicting Congressional claim of authority but with steady Congressional support, the Constitution has not been breached. The war in Vietnam is a product of the jointly supportive actions of the two branches to whom the congeries of the war powers have been committed. Because the branches are not in opposition, there is no necessity of determining boundaries. Should either branch be opposed to the continuance of hostilities, however, and present the issue in clear terms, a court might well take a different view. This question we do not face. Nor does the prospect that such a question might be posed indicate a different answer in the present case.

Affirmed.