Michael **HARRINGTON** et
al., Appellants,

v.

James H. **SCHLESINGER** et
al., Appellees.

No. 74–1573.

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 2, 1974.

Decided Oct. 8, 1975.

**456**

Norman B. Smith, Greensboro, N. C., and Deborah G. Mailman, Raleigh, N. C. (James Keenan, Durham, N. C., and Jerry W. Leonard, Raleigh, N. C., on brief), for appellants.

David N. Cohen, Atty., United States Dept. of Justice (Carla A. Hills, Asst. Atty. Gen., Thomas P. McNamara, U. S. Atty., Robert E. Kopp and Michael H. Stein, Attys., United States Dept. of Justice, on brief), for appellees.

Before HAYNSWORTH, Chief Judge, and BOREMAN, Senior Circuit Judge, and THOMSEN, Senior District Judge.

HAYNSWORTH, Chief Judge.

This action was properly dismissed, for the plaintiffs, citizens and taxpayers, some of whom are members of Congress, lack standing to maintain it.

On July 1, 1973, President Nixon signed into law two bills limiting United States involvement in those four countries comprised in what was once French Indochina. The two Acts prohibit the expenditure of funds to support "combat activities by United States forces" in those countries after August 15, 1973.[1] To halt alleged violations of the laws, four congressmen and seventeen individuals have sued the Secretary of Defense and other officials. They claimed that the United States pays foreign mercenaries to fight, that American military advisors are attached to combat units, that American planes fly reconnaissance missions in support of bombing, that corporations now conduct military activities, that the United States maintains an attache office in South Vietnam, that the United States is stockpiling war ordnance in that area, and that American units still conduct clandestine activities in the area. They assert that expenditures for those activities violate the two Acts and Article I, § 9, Cl. 7 of the Constitution, which provides: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law . . . ." The plaintiffs seek declaratory relief and an injunction to halt shipments of ordnance from the Military Ocean Terminal at Sunny Point, North Carolina, to Indochina[2], to prohibit the use of United States forces in that area, and to ban government spending on the allegedly prohibited activities.

The defendants moved to dismiss on the grounds that the plaintiffs lack standing, that the case involves a nonjusticiable political question, and that the defendants are immune from suit. The District Court granted the motion, deciding that the case involves a political

---

1. Public Law No. 93–50, § 307 provides:

 None of the funds herein appropriated under this Act may be expended to support directly or indirectly combat activities in or over Cambodia, Laos, North Vietnam and South Vietnam . . . by United States forces, and after August 15, 1973, no other funds heretofore appropriated under any other Act may be expended for such purpose[s].

 Public Law No. 93–52, § 108 provides:
 Notwithstanding any other provision of law, on or after August 15, 1973, no funds herein or heretofore appropriated may be obligated or expended to finance directly or indirectly combat activities by United States military forces in or over or from off the shores of North Vietnam, South Vietnam, Laos or Cambodia.

2. We use the term "Indochina" loosely to refer to the countries mentioned in Public Laws 93–50, § 307 and 93–52, § 108: Cambodia, Laos, North Vietnam, and South Vietnam.

question. We affirm on the ground that the plaintiffs lack standing to maintain the action.

## I.

 Seventeen individual plaintiffs assert standing as taxpayers. Indeed, taxpayers do have standing to question the constitutionality of congressional appropriations if they can demonstrate both a logical link between their status as taxpayers and the challenged legislation and a nexus between their taxpayer status and the claimed constitutional infringement. *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947. There the plaintiffs were held to have standing to challenge congressional appropriations in violation of the expressed prohibition of the Establishment and Free Exercise Clause. In considering the presence of the requisite nexus, however, the court is required to look to the substantive issues actually presented for adjudication.[3] The Supreme Court did just that in *United States v. Richardson,* 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678, where the plaintiffs sought to enjoin publication of the "Combined Statement of Receipts, Expenditures, and Balances of the United States Government" upon the ground that it did not include expenditures of the Central Intelligence Agency, which was said to be in violation of the "regular Statement and Account" requirement of Article 1, § 9, Cl. 7 of the Constitution. The majority of a divided Court of Appeals for the Third Circuit, sitting *en banc,* upheld the plaintiff's standing. *Richardson v. United States,* 3d Cir., 465 F.2d 844. It was of the opinion that the plaintiff was challenging the constitutionality of appropriations for the Central Intelligence Agency and that, in any event, discovery of the amount and nature of those expenditures was such an essential precondition to a challenge of the appropriations themselves that the plaintiff's standing as taxpayer had the requisite relation to the constitutional question which was

presented. The Supreme Court reversed. It viewed the issue not as a constitutional challenge to the validity of the congressional appropriations, but as a constitutional challenge to the validity of the statute providing special accounting procedures for the Central Intelligence Agency. The plaintiff's status as a taxpayer, it concluded, lacked the requisite nexus to the real constitutional controversy the case presented.

We must approach this case in the same manner.

The plaintiffs say that their claim is that the alleged expenditures are in violation of the first sentence of Article 1, § 9, Cl. 7 of the Constitution, but the defendants make no claim that the Executive has the right to spend unappropriated funds. There is no dispute about the Executive's being subject to the two statutes limiting expenditures of appropriated funds in Southeast Asia. The only controversy is centered entirely upon the meaning of the two statutes in the context of the expenditure of funds for activities in Southeast Asia after August 15, 1973. Presumptively, the defendants give the statutes a literal reading and assert compliance with them by the withdrawal of United States combatant forces. The plaintiffs clearly seek a much more expansive interpretation of the statutes so as to foreclose expenditures in support of the combatant forces of other nations and other activities which may or may not be combatant. To the extent that the controversy is not now moot by reason of the fall of South Vietnam and Cambodia, it would be resolved by an interpretation of the statutes as applied to whatever activity in Southeast Asia is now being conducted or financially supported by the United States.

 The *Flast* requirements are not met. The plaintiffs present no constitutional challenge to any congressional appropriation. While they cite us to a constitutional limitation upon Executive ex-

---

**3.** *Flast v. Cohen,* 392 U.S. 83, 102, 88 S.Ct. 1942, 20 L.Ed.2d 947.

penditures, the case presents no controversy about the reach or application of that provision. The real issue tendered, and *Flast* requires us to define it, is simply an interpretation of the statutes. Thus there is no nexus between the plaintiffs' status as taxpayers and any live issue regarding any constitutional limitation on the spending powers either of the Congress or of the Executive.

The taxpayers claim of standing is much weaker than that presented to the Supreme Court in *Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706. There the plaintiffs sought injunctive relief requiring the defendants to strike all members of Congress from the reserves of our armed forces and to seek to recover from members of Congress, and former members of Congress, the pay they had received as reservists during their congressional service. They also sought an injunction against the enrollment as a reservist of any other member of Congress during his congressional service and a declaration that a member of the reserves is an officer of the United States within the meaning of the Incompatibility Clause, Article 1, § 6, Cl. 2, and thus that one may not at the same time be a member of the reserves and a member of Congress. Though the relief sought included an injunction requiring an attempt to recover expenditures made in the form of reserve pay to members of Congress and former members, the Supreme Court gave the taxpayers standing claim short shrift. It contrasted *Schlesinger* with *Flast* where the taxpayer challenged congressional spending power under Article 1, § 8, and asserted that the challenged appropriations were in violation of the specific constitutional limits imposed upon the exercise of that spending power. In *Schlesinger* it was said that there was no challenge to any appropriations as being in violation of Article 1, § 8, the challenge being limited to action of the Executive Branch in permitting members of Congress to serve as reservists. In a footnote it was observed that while the Executive could not disburse reserve pay to persons who could not lawfully be reservists, such an act, if it had occurred, was not the consequence of a congressional appropriation authorizing payments to those lawfully enrolled in the reserves.

The clear teaching of *Schlesinger* is that *Flast v. Cohen* is not to be given a broad, expansive reading. It suggests that taxpayer standing may be found to be present only when congressional appropriations are being challenged on constitutional grounds. Whatever the implication of *Schlesinger,* however, we need not consider whether taxpayer standing might be said to be present in a case in which Executive expenditures were challenged on constitutional grounds. If there were a clear and flagrant violation of congressional limitations upon expenditures, a court in a taxpayer suit might find its intervention appropriate, but, as we have seen, there is no such clear or flagrant violation here. All that we have is a controversy about the interpretation and application of congressional statutes under which the challenged expenditures either were or were not authorized. While the effort in *Schlesinger* to compel attempts to recover payments to reservists while members of Congress presented the question of the status of reservists as officers of the United States within the meaning of the Incompatibility Clause, in this case there is simply no issue involving the application and interpretation of any constitutional provision. All that is sought is judicial interpretation of the statutes, as applied, and injunctive relief should that interpretation go in the plaintiffs' favor.

In light of *Richardson* and of *Schlesinger,* we conclude that the plaintiff taxpayers do not meet the *Flast* test.

## II.

The seventeen plaintiffs also claim standing as citizens, but the *Reservists* case again thwarts their claim. Rejecting a citizen's interest in enforcing the Constitution as a basis for standing, the Court stated: "In some fashion, every provision of the Constitution was meant to serve the interest of all. Such

a generalized interest, however, is too abstract to constitute a 'case or controversy' appropriate for judicial resolution. . . . " 418 U.S. at 226–27, 94 S.Ct. at 2935.

### III.

The four congressmen who are plaintiffs assert that their position gives them standing to sue.

■■■ A legislator may sue to prevent dilution of his voting power in the legislature. In *Kennedy v. Sampson,* D.C. Cir., 511 F.2d 430, the Court decided that a Senator had standing to challenge a President's "pocket veto" of a bill for which he had voted. The Senator was challenging the diminution of his voting power in the legislative process.[4] By analogy, the four congressmen in this action claim that they have an interest in ensuring enforcement of laws for which they voted. Once a bill has become law, however, their interest is indistinguishable from that of any other citizen. They cannot claim dilution of their legislative voting power because the legislation they favored became law.

Alternatively, the congressmen argue that a judicial declaration of the legality or illegality of the Executive's activities would affect the performance of their legislative duties.

In *Mitchell v. Laird,* 159 U.S.App.D.C. 344, 488 F.2d 611, the Court stated that a congressman had standing to sue for a declaration that the President was engaging in an unlawful war. The Court thought that the declaration would aid congressmen in deciding on impeachment and other legislative matters. *Id.* at 614. In contrast, the Second Circuit has stated that a congresswoman had no standing to seek an injunction against the fighting in Vietnam. *Holtzman v. Schlesinger,* 2d Cir., 484 F.2d 1307. Rejecting the notion that the declaration

would affect her performance of legislative duties, the Court stated that she was merely seeking an advisory opinion.

■■■ We agree with the Second Circuit. The plaintiffs' status as congressmen does not give them standing to sue for a declaration that Executive activities are illegal. The congressmen's interest seems little different from that of any citizen who might find a court's advice useful in casting his votes in presidential or congressional elections. In both instances the interest is too generalized to provide a basis for standing.

Accordingly, we affirm the District Court's dismissal of the complaint on the ground that plaintiffs lack standing to sue. We express no opinion on whether the issues presented are nonjusticiable political questions.

While we hold that none of the plaintiffs has standing to seek a judicial resolution of the controversy, they are not without a remedy, for the controversy is subject to legislative resolution. If there is a difference between a majority of the members of both houses of Congress and the President as to the interpretation and application of the statutes, the Congress has the resources through its committees to ascertain the facts. With the facts before it, it may tighten the statutory restrictions, if that be the congressional will. The fact that the Congress has done nothing suggests that the Executive's interpretation of the statutes is in agreement with the congressional intent, but that is an issue in this case which we do not reach.

Affirmed.

THOMSEN, Senior District Judge (dissenting):

I concur in those portions of the court's opinion which hold that plaintiffs have no standing as members of Congress or as citizens to maintain this ac-

---

**4.** In *Coleman v. Miller,* 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939), the Supreme Court held that twenty Kansas legislators had standing to petition for certiorari from a Kansas court decision that the Lieutenant Governor had the power to break ties in the state legislature. Since the twenty votes would have stood without the tie-breaking vote, the plaintiffs together had clearly suffered a loss of voting power.

tion; but I respectfully dissent from the ruling that they have no standing as taxpayers to seek an injunction to restrain an alleged violation of Article 1, § 9, Cl. 7 of the Constitution,* based upon their allegation that the executive is drawing money from the Treasury in violation of specific prohibitions in Public Law No. 93–50, § 307 and Public Law No. 93–52, § 108, quoted in footnote 1 of the court's opinion. Whether plaintiffs will be able to prove such a violation is not now before us; some of the alleged acts would not amount to a violation, some have ceased, and if all shall have ceased before the case is concluded, it may well be dismissed as moot.

The two statutes cited by plaintiffs prohibited the use of appropriated funds for specified purposes on or after August 15, 1973. The legal situation before that date was discussed in a number of cases, including *Holtzman v. Schlesinger,* 484 F.2d 1307 (2 Cir. 1973), cited with approval in the court's opinion herein, and *Commonwealth of Massachusetts v. Laird,* 451 F.2d 26 (1 Cir. 1971). The First Circuit case discussed at length the respective powers of the executive and of Congress with respect to belligerent activities, and concluded:

> "As to the power to conduct undeclared hostilities beyond emergency defense, then, we are inclined to believe that the Constitution, in giving some essential powers to Congress and others to the executive, committed the matter to both branches, whose joint concord precludes the judiciary from measuring a specific executive action against any specific clause in isolation. * * * " 451 F.2d at 33.

The court added:

> "The question remains to be asked: when the executive and Congress disagree not as to the advisability of fighting a war but as to the appropriate level of fighting, how shall the Constitution be served? When the executive takes a strong hand, Congress has no lack of corrective power. Congress has the power to tax, to appropriate, to impound, to override a veto. The executive has only the inherent power to propose and to implement, and the formal power to veto. The objective of the drafters of the Constitution was to give each branch 'constitutional arms for its own defense'. The Federalist No. 23, at 476 (Mod.Lib.ed.) (Hamilton). But the advantage was given the Congress, Hamilton noting the 'superior weight and influence of the legislative body in a free government, and the hazard to the Executive in a trial of strength with that body.' *Id.* at 478.

> "All we hold here is that in a situation of prolonged but undeclared hostilities, where the executive continues to act not only in the absence of any conflicting Congressional claim of authority but with steady Congressional support, the Constitution has not been breached. The war in Vietnam is a product of the jointly supportive actions of the two branches to whom the congeries of the war powers have been committed. Because the branches are not in opposition, there is no necessity of determining boundaries. Should either branch be opposed to the continuance of hostilities, however, and present the issue in clear terms, a court might well take a different view. This question we do not face. Nor does the prospect that such a question might be posed indicate a different answer in the present case." 451 F.2d at 34.

The provisions of the two statutes set out in footnote 1 of the court's opinion herein have created, on and after August 15, 1973, the situation foreseen by the First Circuit.

The decisions and the various opinions in *United States v. Richardson,* 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974), and in *Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 94

---

* That clause provides in pertinent part: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law; * * *."

S.Ct. 2925, 41 L.Ed.2d 706 (1974), decided after the First Circuit case, must also be considered. Many of the points discussed in those cases must also be considered in this case, and the decisions in those cases are, of course, binding on this court. Those decisions, however, do not appear to me to require the dismissal of the complaint in the instant case. Various issues may be raised by the answer, in pretrial proceedings and at the trial which cannot now be answered and which may control or affect the ultimate decision. They should be faced as they arise.