**Salvatore ORLANDO, Plaintiff,**

v.

**Melvin LAIRD et al., Defendants.**

**No. 70 C 745.**

United States District Court,
E. D. New York.

July 1, 1970.

**1014**

Alfred Lawrence Toombs, Peter Weiss, New York City, Lawrence R. Velvel, Lawrence, Kan., and Leon Friedman, Mineola, N. Y. (Kunstler, Kunstler & Hyman, Burt Neuborne, Steven J. Hyman, New York City, of counsel) for plaintiff.

Norman Dorsen, New York City, submitted a brief, amicus curiae, on behalf of a group of lawyers and law teachers as amici curiae.

Melvin L. Wulf, New York City, Leon Friedman, Mineola, N. Y., and Burt Neuborne, New York City (Kay Ellen Hayes, New York City, of counsel), submitted a brief, amicus curiae, for American Civil Liberties Union.

Robert A. Morse, Brooklyn, N. Y. (Edward R. Neaher, U. S. Atty., James D. Porter, Jr., New York City, Cyril Hyman, Howard E. Babbush, Brooklyn, N. Y., Edward R. Korman, and Robert Rosenthal, New York City, of counsel), for defendants.

## MEMORANDUM INCORPORATING FINDINGS OF FACT AND ORDER DENYING INJUNCTION

DOOLING, District Judge.

Plaintiff, on June 11, 1970, commenced this action against the Secretary of Defense and the Secretary of the Army praying (a) a declaration that the defendants are without authority to order plaintiff to Indochina, (b) an injunction against defendants so ordering him, (c) a declaration that defendants are without authority to order plaintiff to comply with an order, already issued, directing him to report to Fort Lewis, Washington, for shipment to Indochina, (d) an injunction against defendants' compelling plaintiff to comply with the order or any order of similar tenor, and (e) for other relief. The complaint is (1) that New York Civil Rights Law, McKinney's Consol.Laws, c. 6, §§ 2, 5 and the Constitution of the United States alike forbid such action as underlies the order issued to plaintiff, a citizen of New York, unless it be founded on action of the Congress taken pursuant to the United States Constitution, and the Congress has not taken that action, (2) that New York State joined in forming the Union only upon the terms expressed in the United States Constitution (cf. the Tenth Amendment) and reiterated in Civil Rights Law § 5, and plaintiff's particular rights as a citizen of New York have been violated by the order in question since the order is not based on action taken pursuant to the United States Constitution, (3) that for the reasons set forth in (2) and because the Indochina combat activities violate national treaty obligations, the order violates plaintiff's rights under the Fifth (due process), Ninth (grant of enumerated powers does not imply denial of others to the people), Tenth (powers not granted to United States nor prohibited to States reserved to States and to people), and Fourteenth (State due process, equal rights, etc.) Amendments, and (4) that for reasons set forth in (2) and (3) the order violates plaintiff's right not to

be called on to participate in combat activities of the kind being conducted in Indochina which involve violations of the humane-war treaty obligations of the country, the United States Law of Land Warfare as set forth in Army Field Manual 27–10, and the Nuremberg Principles of International Law as formulated by the United Nations International Law Commission, June–July 1950, and are exemplified by (a) killing non-combatants, (b) using forbidden chemicals, (c) violating prisoners' rights, (d) pillaging and destroying civilian habitations and religious buildings, (e) failing to provide medical aid for wounded enemy soldiers and civilians, (f) bombing populated areas, (g) impairing agricultural land, and (h) taking and destroying food and medical supplies.

Plaintiff is a citizen of the United States and of the State of New York. He first enlisted in the United States Army on November 11, 1965, and re-enlisted on May 8, 1968. His rating is Specialist E5, Ordnance, Aviation, and his special skill is in relation to aviation repair parts and their supply to damaged aircraft. He has never been court-martialled or otherwise disciplined. He has heretofore served in Thailand, for eleven months and seventeen days. After his re-enlistment plaintiff was disappointed in his expectation of assignment; he was doing routine supply work, unrelated to aviation repair-part supply, which he thought any private could do. Without advising his wife that he was doing so, he wrote a letter in November 1969 volunteering for Vietnam service. Later, in February 1970, and probably in the light of his wife's extreme distress at his possible re-assignment to Southeast Asia, he wrote a letter to General Westmoreland. In it he did not express any moral or conscientious objection to the war, but put his unwillingness to return to Asia on the ground of his family situation. At that time he was satisfied that the Government was committed to bringing men out of Vietnam on a fixed schedule and thought that it was the best thing that could be done. However, when the Cambodian incursion occurred, he feared the whole conflict would be widened, and he had no confidence that the Government's later statements about withdrawal would be carried out. He had, somehow, lost his much earlier confidence that the entire effort was justifiably and rightly directed toward preventing the Communists from taking over more and more land in Asia—where there is more than half the world's population. After Cambodia he began to think that he might be sent into Cambodia or reassigned to be a door gunner on a helicopter. He remembered being told of, and continued to hear of, and to see on television, episodes in which soldiers fired on people they could not be sure were soldiers or even men; he heard stories of barbarisms committed on prisoners; he realized that when he reached Vietnam he would be issued an M-16 and 90 rounds of live ammunition; as he put it (Tr. 84), "They are asking me to kill by giving me that weapon in Vietnam." He felt, after Cambodia, that (Tr. 85) "they are going to come back strong and I don't want to be there when it happens. I can't see what there is much to get killed over there, I can't see dying for those Southeast Asians, the entire lot of them don't like Americans, at any one time they stab you in the back, I can't see that kind of people, I can't see myself dying for them." Again, he put it (Tr. 110), " * * * and I am scared that * * * I might have to kill somebody that shouldn't have to be killed, and it would be on my conscience, and I just can't see my killing anybody, I have never done it before and I don't ever want to do it." Explaining his fear, he said (Tr. 118–119), " * * * I just couldn't see me climbing up on a helicopter and shooting * * * and he told me * * * they just would see a movement, and even though they didn't know what it is they would just shoot at it anyway, and that's when I started to say that ain't for me * * *. Well, if that is true, I just, I couldn't do it * * * it would be the first time I

disobeyed an order because I wouldn't shoot if I was a door gunner unless possibly they were shooting at me, it's either them or me." His frame of mind became (Tr. 120–121), "I am not willing to serve, if I had to go, I mean if I was forced to go I would go because I don't want to go to jail."

Plaintiff received orders placing him on home leave and directing him thereafter to report on June 14, 1970, to Fort Lewis, Washington, for shipment to Vietnam. His orders were later changed to extend the date to June 23, 1970.

Before commencing the action for relief from the order, and after first speaking to counsel, plaintiff had misgivings about suing; he did not want to get into any trouble with the Army about it; he advised the Department of the Army of his intended action, and he believed that he had the Department's assurance that there would not be any kickback on it provided his lawyers kept him out of trouble, and kept in touch with the Department's lawyer at Fort Monmouth and so kept the Department advised of what happened (Tr. 98–100). Thereafter the present action was commenced.

It is concluded that an injunction *pendente lite* is not warranted. The order is authorized in the constitutional sense. Whether other avenues of relief are open to plaintiff under Army procedures in view of his present conscientious attitude toward Vietnam combat is not properly involved in this action.

■ ■  The constitutional provisions relating to war and the military are given in the Appendix to this opinion. In the light of Berk v. Laird, 429 F.2d 302, 2d Cir. 1970, it is seen that the question of the validity of the order to plaintiff is justiciable, and the immediate issue is whether the matter is specifically decidable by standards of the kind that the judiciary have found manageable. No unusual subject matter is presented. Decisions in the entire area of the taking and arresting of combat action are exclusively political in kind, but determining whether or not a political deci-

sion has been taken by the appropriate set of governmental acts inescapably presents a purely judicial question when the existence or non-existence of a valid political authorization as the source of a particular command is drawn in question by one directly affected by it in his individual liberty as a citizen. The fear that judicial decision—by injunction or habeas corpus—could produce an effect of a scope and nature usually absorbed in political action is unreal. Necessarily based on identification of a defect in authorization, the only consequence can be resumption of conformity to constitutional · norms of political conduct to achieve, dilute, deflect or reverse the desired political objectives. Neither the range of political invention nor the content of political decision concerning the deployment and use of combat force is determinable or terminable by judicial decisions that unflinchingly point to and insist upon compliance with the required constitutional components of any political decision to commence, continue and terminate the use of the nation's combat resources in men and materials.

■  Neither the language of the Constitution nor the debates of the time leave any doubt that the power to declare and wage war was pointedly denied to the presidency. In no real sense was there even an exception for emergency action and certainly not for a self-defined emergency power in the presidency. The debates, so often strangely—to our ears—devoid of respect for and alive with fears of the presidency that the Convention was forming, are clear in the view that (as Wilson put it) the power to make war and peace are legislative (1 Farrand, Records of the Federal Convention of 1787 (Rev.Ed.1937, Repr. 1966) 65, 73). The issue was where to poise it. Mason was concerned that "The purse & the sword ought never to get into the same hands (whether Legislative or Executive.)" 1 Farrand 139–140. The draft presented by the Committee of Detail on August 6, 1787, expresses the power as the power "To make war" (2 Farrand 182) and on Au-

gust 17th that language was amended (2 Farrand 318–319) to read "To declare war"—Madison and Gerry so moving on the ground of its "leaving to the Executive the power to repel sudden attacks"; Sharman thought "make" the better word for the amenders' purposes—"The Executive shd. be able to repel and not to commence war. 'Make' better than 'declare' the latter narrowing the power too much"; to which Gerry answered that he "never expected to hear in a republic a motion to empower the Executive alone to declare war"; Elseworth thought the cases of "making *war*" and "making *peace*" materially different— "It shd. be more easy to get out of war, than into it. War also is a simple and overt declaration peace attended with intricate & secret. negociations"; Mason opposed granting the power either to the Executive (as Butler had proposed on the ground that he had "all the requisite qualities, and will not make war but when the Nation will support it") "because not [safely] to be trusted with it," *or to the Senate (as Pinkney had proposed)* "because not so constructed as to be entitled to it. He was for clogging rather than facilitating war; but for facilitating peace. He preferred 'declare' to 'make' "; the motion to substitute "declare" for "make" was then agreed to. Pinkney's motion to strike the clause entirely, and Butler's motion "to give the Legislature power of peace, as they were to have that of war," by adding "and peace" after "war," were both lost (2 Farrand 319).

The language of the Constitution makes the war power a legislative power rather than an executive power, and it makes it a federal power rather than a state power, without in either instance negating the co-existence of a duty to repel attack or actual invasion. Nothing relevant flows from the designation of the president as commander-in-chief of the armed forces except to confirm that his executive power includes the power to "conduct" wars declared by legislative act (cf. 2 Farrand 319, footnote), to deny autonomy to the military, and to locate the fountainhead of necessary emergency combat initiatives when the straitness of the exigency denies the Congress the time to act.

The genuine questions presented by the combat activities in Vietnam are whether the activities constitute "war," or are a genus of Governmental activity that cannot be characterized as war, whether, if the latter, they can be authorized by the Executive, and, if they are "war" or otherwise are beyond the authority of the Executive, whether they have been authorized by legislative action. Plaintiff contends that the Vietnam combat activities are "war" and require explicit Congressional sanction that cannot be found in the Tonkin Gulf resolution, 78 Stat. 384, the appropriation acts, the extension and amendment of the Selective Service Act, and other such supportive acts. The defendants argue broadly that there exists a genus of combat activities distinct from war that is only politically definable, that historically the presidency has dealt with these usually exigent situations without Congressional authorization or constraint, and that, so far as the Vietnam combat activities are concerned, they do not constitute "war," they are within the range of recognized presidential powers, and, whatever their precise classification, have been ratified and authorized by repeated Congressional actions which may also be viewed as a cumulative and authoritative political determination that the action of the presidency is not usurpation of legislative authority.

The historic examples of the variety of the occasions on which the presidency has used combat force, or deployed the military as a threat of such force (given to considerable extent in Wormuth, The Vietnam War: The President versus the Constitution, 1968, 21–35, in the United States Attorney's Brief in the *Berk* case in the Court of Appeals, and, summed up by classes in the ACLU Brief, pp. 6–8), and the examples of more or less specific Congressional authorizations of limited combat authority,

do not solve the questions presented, but clearly indicate the difficulty and variety of the cases presented, and the absence of compelling judicial precedent. The instances having a magnitude approaching Vietnam (conspicuously the Korean instance) would inevitably have been, as Vietnam is, instances in which the only problem is to elucidate the nature and effect of Congressional responsibility for the waging of the combat activity.

The Constitution does not simply make the power to declare war a legislative power, it makes the related powers over the military, their provision and their governance equally matters of legislative concern, and extends the legislative power to calling up the militia to repel invasion and even to the granting of letters of marque, a species of authorized predation seemingly of a dimension to concern the Executive rather than to involve the legislative process. The systematic vesting of control over the means and the determination of the occasions of belligerency in the Congress makes inevitable that no combat activity of magnitude in size and duration can continue without affirmative and systematic legislative support. That Vietnam long ago attained that magnitude is history. It is, therefore, needless to stop now to decide whether the aggregate of the Constitutional provisions and the debates in the constitutional convention teach that no combat initiative is lodged in the presidency or in the states nor any authority to take combat action except where defensive exigency requires it and time does not admit of a resort to Congress or to decide whether, beyond peradventure, there can be no presidential power to take combat initiatives where the question whether or not to do so involves a political determination of national policy and is not compelled by military exigency. *Cf.* Indochina: The Constitutional Crisis, reprinted, Congressional Record May 15, 1970, pp. S 7117–S 7123.

The military activities of the United States in Vietnam have been a central national political issue for years; no issue has been more bitterly, if not honestly, debated. The outcome of two presidential elections has reputedly been influenced if not determined by the candidates' positions on the issues; a very considerable number of elections to Senate and to House have reportedly been influenced if not determined by the Vietnam issue. Reports of public opinion samplings on Vietnam issues are regular news staples. The statistical measures, in lives of men, numbers of wounded, annual cost in money, and in men engaged, are doubtless the most publicized statistics in recent history. The Congress, particularly, has been deeply concerned in the issue, and its implementation of the Vietnam combat activities has been complete and unstinting.

The huge appropriations annually voted to sustain the expanding combat activity cannot be read out of being as extorted by the exigencies created by presidential seizures of combat initiatives. *Cf.* Congress, the President, and the Power to Commit Forces to Combat, 1968, 81 Harv.L.Rev. 1771, 1801. The power of the purse was lodged in the House and the appropriation power was expressly limited when exercised to raise and support armies as part of the conscious constitutional scheme for controlling the Executive's resort to combat activities. Specific appropriation statutes here, as the Government's brief points out, leave no uncertainty about Congressional will and purpose. The repeated amendment of the Selective Service Act with, inevitably, the knowledge that the numbers drafted were determined in large part by the demands of the expansion in the number of men committed to Vietnam combat and, later, by the need to maintain the rotation of men to Vietnam, has been a specific and purposeful provision of men to the continuance of the combat activity. Even in modest points of legislative detail, Congressional concern in the combat activities is perfectly explicit and advertent. For Veterans' Benefits purposes "period of war" has now been defined by the Con-

gress as including "the Vietnam Era" which in turn is defined as the period beginning August 5, 1964, and to end upon still future Presidential proclamation or concurrent resolution of the Congress. 38 U.S.C. § 101(11), (29). Aliens are relieved of paying naturalization fees if they have served in the armed forces between February 28, 1961, and the future date to be designated by Presidential Executive Order as the date of the termination of the Vietnam hostilities.

It is passionately argued that none of the acts of the Congress which have furnished forth the sinew of war in levying taxes, appropriating the nation's treasure and conscripting its manpower in order to continue the Vietnam conflict can amount to authorizing the combat activities because the Constitution contemplates express authorization taken without the coercions exerted by illicit seizures of the initiative by the presidency. But it is idle to suggest that the Congress is so little ingenious or so inappreciative of its powers, including the power of impeachment, that it cannot seize policy and action initiatives at will, and halt courses of action from which it wishes the national power to be withdrawn. Political expediency may have counseled the Congress's choice of the particular forms and modes by which it has united with the presidency in prosecuting the Vietnam combat activities, but the reality of the collaborative action of the executive and the legislative required by the Constitution has been present from the earliest stages.

It is urged that evidence can be produced to demonstrate, in effect, that a steady course of executive usurpation of initiatives that, constitutionally, require the coaction of the Congress and the Executive has rendered the Congress impotent to withhold the grudging and involuntary appropriations and implementing laws relied on as constituting its authorization of combat activities in Southeast Asia. But extended argument has brought out that the reference is to the now-familiar compilations and analyses of the combat occasions of the past cou pled with proffered testimony of members of Congress that their supportive votes were coerced by the predicament in which unauthorized executive action had placed the lives of men and the honor of the nation and do not reflect a will to ratify usurped initiatives. That, however, is simply a charge of Congressional pusillanimity. Such evidence, and its extent and validity are not to be supposed, could only disclose the motive and could not disprove the fact of authorization. The Constitution presents the Congress with the opportunity for it, but it cannot compel the making of unpopular decisions by the members of Congress. The long-term trend of the basic initiatives of Government to emanate from the presidency—an outgrowth possibly of the duties imposed by Article II, Section 3—is not confined to the context of foreign affairs and limited warfare, and it may as much reflect the necessities of national government today as the failure of the Congress itself to function effectively in the affirmative formation of national policy.

The place of the controversial Tonkin Gulf Resolution (Public Law 88–408, 78 Stat. 384) in the whole of Congressional action is unclear; its importance no doubt lay in its practical effect on the presidential initiative rather than its constitutional meaning, but it has not the compelling significance of the steady legislative support of the prosecution of the war.

The argument drawn from the New York Civil Rights Law falls with the conclusion that no defect exists in the constitutionality of the commitment of the nation to the combat activities in Vietnam.

■■ The separate set of contentions revolving around the alleged contravention of treaty obligations and the conventions directed to securing humane conduct of war can not alter the result. However unreal must be the expectation of universal compliance in the final test of combat conditions, every soldier is expected to abide by the rules of humane

war and to avoid participation in war-crime. That it has been difficult to do that in Vietnam may be true, may be assumed for present purposes—the sincerity if not the balance of the testimony outlined in the offer of proof is assumed —but there is no escape from such problems. The famous correspondence between Generals Sherman and Hood at Atlanta exhibits the timeless dilemma. See 2 Sherman, Memoirs (Indiana University Press ed. 1957) 119–129. If the whole combat effort is a breach of peace-keeping obligations assumed by the nation in regularly adopted treaties, that does not, in the present stage of development of international law, invalidate such a specific military order as plaintiff's. As between citizen and nation the citizen is bound by the national decision and must acknowledge its effect as an internally valid governmental act whether or not the nation is embarked on a breach of treaty obligation.

Accordingly, no case is made out for a preliminary injunction, and it is

Ordered the motion for a preliminary injunction is denied, except to the extent that the restraining order of June 12, 1970, is continued in effect as a temporary injunction made after notice and hearing until the close of the Court day on July 7, 1970, in order to give plaintiff an opportunity to seek relief from the present order.

## APPENDIX

### CONSTITUTION OF THE UNITED STATES

#### ARTICLE I

Section. 1. All legislative Powers herein granted shall be vested in a Congress of the United States, * * *.

Section. 7. All Bills for raising Revenue shall originate in the House of Representatives; but the Senate may propose or concur with Amendments as on other Bills. * * *

Section. 8. The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States; * * *.

To define and punish * * * Offences against the Law of Nations;

To declare War, grant Letters of Marque and Reprisal, and make Rules concerning Captures on Land and Water;

To raise and support Armies, but no Appropriation of Money to that Use shall be for a longer Term than two Years;

To provide and maintain a Navy;

To make Rules for the Government and Regulation of the land and naval Forces;

To provide for calling forth the Militia to execute th. ‾aws of the Union, suppress Insurrections and repel Invasions;

To provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress;

To exercise exclusive Legislation in all Cases whatsoever, * * * over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings;—And

To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof.

Section. 9. * * * The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it. * * *

Section. 10. No State shall * * * grant Letters of Marque and Reprisal; * * *.

No State shall, without the Consent of Congress, * * * keep Troops, or

Ships of War in time of Peace, enter into any Agreement or Compact with another State, or with a foreign Power, or engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay.

## ARTICLE II

Section. 1. The executive Power shall be vested in a President of the United States of America. * * *

Section. 2. The President shall be Commander in Chief of the Army and Navy of the United States, and of the Militia of the several States, when called into the actual Service of the United States; * * *.

He shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur; and he shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, * * * but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, * * * or in the Heads of Departments. * * *

Section. 3. He shall from time to time give to the Congress Information of the State of the Union, and recommend to their consideration such Measures as he shall judge necessary and expedient; he may, on extraordinary Occasions, convene both Houses, or either of them, and in Case of Disagreement between them, with Respect to the Time of Adjournment, he may adjourn them to such Time as he shall think proper; he shall receive Ambassadors and other public Ministers; he shall take Care that the Laws be faithfully executed, and shall Commission all the Officers of the United States.

Section. 4. The President, * * * shall be removed from Office on Impeachment for, and Conviction of, Treason, Bribery, or other high Crimes and Misdemeanors.

* * *

## ARTICLE IV

* * *

Section. 3. * * * The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States; * * *.

Section. 4. The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic Violence.

* * *

## ARTICLE VI

* * *

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; * * *.

## [AMENDMENTS]

* * *

## ARTICLE [II]

A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

## ARTICLE [III]

No Soldier shall, in time of peace be quartered in any house, without the consent of the Owner, nor in time of war, but in a manner to be prescribed by law.

* * *

## ARTICLE [V]

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; * * *.