**Robert F. DRINAN et al., Plaintiffs,**

v.

**Richard M. NIXON et al., Defendants.**

**Civ. A. No. 73–1424.**

United States District Court,
D. Massachusetts.

Aug. 8, 1973.

Allan R. Rosenberg, Boston, Mass., Peter Weiss, Center for Constitutional Rights, New York City, for plaintiffs.

William A. Brown, Asst. U. S. Atty., Boston Mass., for defendants.

## OPINION

TAURO, District Judge.

This is an action seeking declaratory judgment that the aerial combat operations currently being conducted by the United States in Cambodia are in violation of domestic and international law, and requesting appropriate injunctive relief. Plaintiffs challenge the legality of these military operations after the withdrawal of United States forces from South Vietnam and the release of the prisoners of war.

Plaintiffs are four members of the United States House of Representatives and an airman in the United States Air Force stationed at L. G. Hanscom Field, Massachusetts. Defendants are Richard M. Nixon, President of the United States, Elliott Richardson, former Secretary of Defense, William Clements, Acting Secretary of Defense, and John McLucus, Acting Secretary of the Air Force.

Plaintiffs have moved for summary judgment upon that portion of the complaint seeking declaratory relief.

Defendants have moved to dismiss on the grounds that the action constitutes an unconsented suit against the sover-

eign, that plaintiffs lack standing to maintain the action, that the action presents a nonjusticiable political question, and that the complaint fails to state a claim upon which relief can be granted.

■ The motion to dismiss raises a threshold issue: does plaintiffs' challenge to the military activity in Cambodia constitute a nonjusticiable "political question." See Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). For the reasons set forth below, we conclude that the issues raised involve political questions, in the legal sense of the term, which are beyond the authority of a federal court to hear or determine. We do not, therefore, reach the other grounds for dismissal asserted by defendants.[1]

What do we mean by the term political question and how do the issues involved in this case fit within the framework of that definition?

Justice Brennan writing for the Supreme Court in the case of Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), provides us with a comprehensive definition of what constitutes a "political question":

It is apparent that several formulations which vary slightly according to the settings in which the questions arise may describe a political question, although each has one or more elements which identify it as essentially a function of the separation of powers. Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

369 U.S., at 217, 82 S.Ct., at 710.

■ Although not all issues involving foreign relations are political questions,[2] courts are particularly discriminating in determining the propriety of considering issues involving the conduct of foreign affairs by the executive and legislative branches. Baker v. Carr, 369 U.S. 186, 211, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); Atlee v. Laird, 347 F.Supp. 689, 697 (E.D.Pa.1972) (three-judge court), affm'd summarily, 411 U.S. 911, 93 S.Ct. 1545, 36 L.Ed.2d 304 (1973). There are compelling and practical reasons which underscore the necessity for judicial restraint in this area. Courts have neither inherent expertise nor ready access to the type of current information necessary to render informed and valid judgments as to the wisdom of executive and congressional actions involving this country's relations with other sovereigns.[3]

---

1. See DaCosta v. Laird, 471 F.2d 1146, 1152 (2d Cir. 1973).

2. *But see*, "The conduct of the foreign relations of our Government is committed by the Constitution to the Executive and Legislative—'the political'—Departments of the Government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision." Oetjen v. Central Leather Co., 246 U.S. 297, 302, 38 S.Ct. 309, 311, 62 L.Ed. 726 (1918).

3. In his August 1, 1973 opinion, Justice Marshall had before him only the question as to the propriety of vacating the stay of the Second Circuit. It is significant to note, however, that in his brief observations as to the conflicting exigencies of the situation he indicated his sensitivity as to the dangers of judicial involvement in matters affecting military policy.

 "But it cannot be denied that the assessment of such injury poses the most sensitive of problems, about which Justices of this Court have little or no information

Not only does resolution of such issues frequently turn on standards that defy judicial application, or involve the exercise of a discretion demonstrably committed to the executive or legislature; but many such questions uniquely demand single-voiced statement of the Government's views.

Baker v. Carr, 369 U.S. 186, 211, 82 S. Ct. 691, 707, 7 L.Ed.2d 663 (1962).

Absent a clear abdication of their constitutional responsibilities, we must rely on the good faith efforts of those in the so-called "political branches" to preserve, protect, and enhance the position of the United States in the world community. In the exercise of their discretion they are accountable only to the people of this country whose judgment is most effectively voiced by means of the electoral process.

By the constitution of the United States, the President is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character, and to his own conscience. To aid him in the performance of these duties, he is authorized to appoint certain officers, who act by his authority, and in conformity with his orders. In such cases, their acts are his acts; and whatever opinion may be entertained of the manner in which executive discretion may be used, still there exists, and can exist, no power to control that discretion. The subjects are political: they respect the nation, not individual rights, and being entrusted to the executive, the decision of the executive is conclusive.

Marbury v. Madison, 5 U.S. (1 Cranch) 137, 165–166, 2 L.Ed. 60 (1803).

This concept of judicial restraint in such matters was recognized by Judge Wyzanski in the case of Mitchell v.

Laird, 155 U.S.App.D.C. 88, 476 F.2d 533, 538–539 (1973):

When on January 20, 1969 President Nixon took office, and when on the same or even later dates the other individual defendants took their present offices, they were faced with a belligerent situation not of their creation. Obviously, the President could not properly execute the duties of his office or his responsibility as Commander-in-Chief by ordering hostilities to cease on the very day he took office. Even if his predecessors had exceeded their constitutional authority, President Nixon's duty did not go beyond trying, in good faith and to the best of his ability, to bring the war to an end as promptly as was consistent with the safety of those fighting and with a profound concern for the durable interests of the nation—its defense, its honor, its morality.

Whether President Nixon did so proceed is a question which at this stage in history a court is incompetent to answer. A court cannot procure the relevant evidence: some is in the hands of foreign governments, some is privileged. Even if the necessary facts were to be laid before it, a court would not substitute its judgment for that of the President, who has an unusually wide measure of discretion in this area, and who should not be judicially condemned except in a case of clear abuse amounting to bad faith. Otherwise a court would be ignoring the delicacies of diplomatic negotiation, the inevitable bargaining for the best solution of an international conflict, and the scope which in foreign affairs must be allowed to the President if this country is to play a responsible role in the council of the nations.

In short, we are faced with what has traditionally been called a "political

---

or expertise. While we have undoubted authority to judge the legality of executive action, we are on treacherous ground in-

deed when we attempt judgments as to its wisdom or necessity." Holtzman v. Schlesinger, Slip opinion, p. 6.

question" which is beyond the judicial power conferred by Article III of the United States Constitution. And on that ground the complaint was properly dismissed by the District Court.

■ This is not to say that the courts may never have a proper role to play in the area of foreign relations, particularly with respect to involvement of this country in a war. On the contrary, should it be apparent that the political branches themselves are clearly and resolutely in opposition as to the military policy to be followed by the United States, such a conflict could no longer be regarded as a political question, but would rise to the posture of a serious constitutional issue requiring resolution by the judicial branch.

■ In order to rise to the level of a constitutional question, however, the conflict between the executive and legislative branches must be clear and at least apparently incapable of resolution, absent judicial intervention. Stated another way, a federal court may judge the propriety of war activities of the executive and legislative branches only when there is a clear conflict between the actions taken by them.

This doctrine was enunciated clearly by Chief Judge Coffin in the case of Massachusetts v. Laird, 451 F.2d 26 (1st Cir. 1971), in which the Commonwealth of Massachusetts and certain members of the armed forces sought a declaration that the United States military involvement in Vietnam at the time was unconstitutional, as well as an injunction preventing the Secretary of Defense from ordering Massachusetts inhabitants to duty in Southeast Asia unless Congress declared war or otherwise authorized United States participation.

Emphasizing the "prolonged period of Congressional support of executive activities" in the conduct of the war, 451 F.2d, at 34, the Court of Appeals affirmed dismissal of the complaint. Concluding that the "joint concord" of Congress and the executive precluded inter-ference by the judiciary, Circuit Judge Coffin (now Chief Judge) wrote:

Because the branches are not in opposition, there is no necessity of determining boundaries. Should either branch be opposed to the continuance of hostilities, however, and present the issue in clear terms, a court might well take a different view.

451 F.2d, at 34.

Judge Coffin's position, requiring demonstration of a clear conflict between the branches before judicial intervention would be permitted, is supported by the case of Atlee v. Laird, 347 F. Supp. 689 (E.D.Pa.1972), (three-judge court), affm'd summarily, 411 U.S. 911, 93 S.Ct. 1545, 36 L.Ed.2d 304 (1973). After an exhaustive consideration of the development of the political question doctrine, the three-judge court concluded (over the dissent of Chief District Judge Lord) that:

The position . . . that a federal court may properly examine on the merits the scope of the war-making powers of the political branches in other than a case of conflict between the actions taken by both branches has simply never been the law.

347 F.Supp., at 694.

The Second Circuit has similarly held that an action challenging President Nixon's directive ordering the mining of the harbors of North Vietnam and the continuance of air and naval strikes presented a nonjusticiable political question because of " . . . the mutual participation of Congress and the President . . . ." Chief Judge Kaufman emphasized that:

[W]e must recognize that those two coordinate branches of government— the Executive by military action and the Congress, by not cutting off the appropriations that are the wherewithal for such action—have taken a position that it is not within our power, even if it were our wish, to alter by judicial decree.

DaCosta v. Laird, 471 F.2d 1146, 1157 (2d Cir. 1973).

In still another opinion, the Second Circuit wrote:

> Beyond determining that there has been *some* mutual participation between the Congress and the President, which unquestionably exists here, with action by the Congress sufficient to authorize or ratify the military activity at issue, it is clear that the constitutional propriety of the means by which Congress has chosen to ratify and approve the protracted military operations in Southeast Asia is a political question.

Orlando v. Laird, 443 F.2d 1039, 1043 (2d Cir. 1971), cert. denied, 404 U.S. 869, 92 S.Ct. 94, 30 L.Ed.2d 113. See also Berk v. Laird, 429 F.2d 302 (2d Cir. 1970), cert. denied, 404 U.S. 869, 92 S. Ct. 94, 30 L.Ed.2d 113.

It is to be noted that in their supplemental memorandum plaintiffs agree with defendants' interpretation of the rule of the First Circuit, "that the war in Indochina is a political question when there is some cooperation by Congress, and in absence of specific opposition by Congress, a Court will not intervene." Defendants' Memorandum at p. 8; Plaintiffs' Supplemental Memorandum at p. 5.

In order to determine whether there is a conflict between the branches, it is important to consider as a threshold matter the respective prerogatives and responsibilities of the political branches in determining and implementing the war policy of this country. The Constitution grants to Congress the power to declare war, Art. I, § 8, cl. 11; to raise and support armies, Art. I, § 8, cl. 12; to provide and maintain a navy, Art. I, § 8, cl. 13; and to make rules for the government of the land and naval forces, Art. I, § 8, cl. 14. The President is made the Commander-in-Chief of the Army and Navy. Art. II, § 2.

■ There is ample authority to support the proposition that Congress does not have the exclusive right to determine whether or not the United States will engage in war.

> [T]here are some types of war which, without Congressional approval, the President may begin to wage: for example, he may respond immediately without such approval to a belligerent attack, or in a grave emergency he may, without Congressional approval, take the initiative to wage war. Otherwise the country would be paralyzed. Before Congress could act the nation might be defeated or at least crippled. In such unusual situations necessity confers the requisite authority upon the President. Any other construction of the Constitution would make it self-destructive.

Mitchell v. Laird, 155 U.S.App.D.C. 88, 476 F.2d 533, 536 (1973).

The relative roles and responsibilities of the three branches of government in a situation involving an undeclared hostility were defined by Chief Judge Coffin in Massachusetts v. Laird, 451 F.2d 26, 33 (1st Cir. 1971):

> As to the power to conduct undeclared hostilities beyond emergency defense, then, we are inclined to believe that the Constitution, in giving some essential powers to Congress and others to the executive, committed the matter to both branches, whose joint concord precludes the judiciary from measuring a specific executive action against any specific clause in isolation. *Cf.* Oetjen v. Central Leather Co., 246 U.S. 297, 302, 38 S.Ct. 309, 62 L.Ed. 726 (1918).

■ Given a challenge to the constitutionality of an undeclared military operation which, as in this case, assumes the President's unilateral undertaking exceeds his emergency powers, the court's role is to determine whether in some manner Congress has expressly or impliedly ratified his actions. Massachusetts v. Laird, 451 F.2d 26 (1st Cir. 1971).

■ Congressional ratification for the continuation of war activity may be found absent a formal declaration to

that effect. The manner and form of ratification is exclusively within the discretion of the Congress. The courts have no authority to second-guess the Congress as to either the wisdom or form of its approval. The court's role is solely that of analyzing the action of Congress which ostensibly constitutes ratification to determine if it does in fact pass constitutional muster.

[W]e deem it a political question, or, to phrase it more accurately, a discretionary matter for Congress to decide in which form, if any, it will give its consent to the continuation of a war already begun by a President acting alone. See Massachusetts v. Laird, *supra,* aff'g s. c., 327 F.Supp. 378 (D. Mass.1971); Orlando v. Laird, *supra;* Berk v. Laird, 317 F.Supp. 715 (E.D. N.Y.1970). That is, we regard the Constitution as contemplating various forms of Congressional assent, and we do not find any authority in the courts to require Congress to employ one rather than another form, if the form chosen by Congress be in itself constitutionally permissible.

Mitchell v. Laird, 155 U.S.App.D.C. 88, 476 F.2d 533, 537–538 (1973).

The form which congressional authorization should take is one of policy, committed to the discretion of the Congress and outside the power and competency of the judiciary, because there are not intelligible and objectively manageable standards by which to judge such actions.

Orlando v. Laird, 443 F.2d 1039, 1043–1044 (2d Cir. 1971), cert. denied, 404 U.S. 869, 92 S.Ct 94, 30 L.Ed.2d 113.

It is within this legal framework that we must examine the facts evidencing the relationship between the executive and legislative to determine whether they are in clear and resolute conflict so as to present a constitutional as opposed to political question.

Plaintiffs do not press any challenge to the constitutionality of military activities prior to the date by which United States forces withdrew from South Vietnam and American prisoners of war were returned.[4] Indeed, a careful review of the enactments of Congress regarding military action in Cambodia reveal support for such action, at least until both of the above-mentioned contingencies had occurred.

Rather, plaintiffs focus the court's attention on the period following April 1, 1973, to the present, a period characterized by continuing bombing in Cambodia and continuing debate and disagreement between the branches as to the authority of the executive to conduct such bombing, including a June 27 veto by the President of anti-bombing legislation. (See Appendix).

■ There can be no question that, during this period, the Congress was clearly at odds with the executive concerning the conduct of military activities. The issue to be determined, however, is whether such disagreement as to military policy went beyond the boundaries of traditional dispute and disagreement, which are the prerogatives of these two independent branches, so as to reach the point of clear and resolute conflict that would warrant judicial intervention. For the reasons set forth below, we conclude that the effecutation of the so-called "August 15 Compromise" demonstrates clearly and objectively that the branches were not in resolute conflict. To the contrary this event clearly evidences that the branches, themselves, were able to resolve the serious and emotion-charged differences that had occupied them for a number of weeks.

Although the bombing continues, the debate has effectively terminated with the passage on June 30 of legislation constituting the "August 15 Compromise." It is this legislation and the circumstances surrounding its passage on which we rely in determining the issue presented.

4. It should be noted as well that plaintiffs do not press their international law claims.

Plaintiffs' heavy reliance on their argument with respect to the legal significance of the President's veto is misplaced in the present posture of the fact situation before us. (Plaintiffs' Supplemental Memorandum, pp. 6–7). The Congress had before it the option of litigating that precise question. Indeed, had the Congress not enacted legislation on June 30 leading to the August 15 Compromise, that very question would have been the pivotol issue before this court. Moreover, the resolution of that exact question would have been before Judge Judd as he rendered his opinion on July 25, 1973, and would have been before the Second Circuit Court of Appeals on August 8. See Holtzman v. Schlesinger, 361 F.Supp. 553 (E.D.N.Y. 1973), rev'd 484 F.2d 1307 (2d Cir. 1973). But Congress chose not to test that question but, rather, selected a course of action which made *its* June 30 enactments the necessary focal point of judicial analysis, and not the President's June 27 veto. Had Congress not so acted, but instead clearly indicated its resolute unwillingness to compromise, we would have a clear issue of conflict before us that would have required judicial determination.

In order to focus with proper perspective on this legislation, it is necessary to consider the circumstances and events which led to their enactment. While these events are detailed in the Appendix, it is sufficient for present purposes to focus on congressional action leading to passage of the so-called Eagleton Amendment and the events which followed.

Briefly, on May 31, 1973, the Senate adopted (63 to 19) the Eagleton Amendment, 119 Cong.Rec.S. 10128 (daily ed. May 31, 1973), which provided:

Sec. 305. None of the funds herein appropriated under this Act or heretofore appropriated under any other Act may be expended to support directly or indirectly combat activities in, over or from off the shores of Cambodia or in or over Laos by United States forces.

119 Cong.Rec.S. 9827 (daily ed. May 29, 1973).

After consideration by a conference committee of the two houses, the House voted (235 to 172) on June 25, 1973, to accept the Eagleton Amendment. 119 Cong.Rec.H. 5268 (daily ed. June 25, 1973). The House rejected (204 to 204) a proposal to delay the effect of the Eagleton Amendment. *Ibid.*, H. 5274.

On June 26, 1973, the Senate voted (81 to 11) favorably on the conference report containing the Eagleton Amendment. 119 Cong.Rec.S. 12057 (daily ed. June 26, 1973).

On June 27, 1973, President Nixon vetoed H.R. 7447, stating that he did so because of his grave concern that the "Cambodia rider" contained in the bill "would cripple or destroy the chances for an effective negotiated settlement in Cambodia . . . ." See 119 Cong. Rec.H. 5486 (daily ed. June 27, 1973).

The House failed to override the veto, voting 241 to 173 (35 votes short of the required ⅔ vote). 119 Cong.Rec.H. 5487 (daily ed. June 27, 1973).

As of June 27, 1973, therefore, Congress was clearly at odds with the executive concerning the conduct of military activities in Cambodia. Within 48 hours, however, it became apparent that this conflict between the branches was not resolute. On June 30 both branches considered and passed legislation whose purpose, as is demonstrated clearly by the extensive debate in both branches, was to avoid a constitutional crisis by effecting a compromise between the branches. The compromise was memorialized by the enactment of The Joint Resolution Making Continuing Appropriation for Fiscal 1974, Pub.L. 93–52, 87 Stat. 130, which provided in pertinent part that:

Sec. 108. Notwithstanding any other provision of law, on or after August 15, 1973, no funds herein or heretofore appropriated may be obligated or expended to finance directly or indirectly combat activities by United States military forces in or over or

from off the shores of North Vietnam, South Vietnam, Laos or Cambodia.

Pub.L. 93–52, 93d Cong., 1st Sess.

The resolution became law on July 1, 1973, with the President's signature. Also signed into law on July 1, was the Supplemental Appropriations Act for Fiscal 1973, Pub.L. 93–50, 87 Stat. 99 which reads in pertinent part:

Sec. 307. None of the funds herein appropriated under this Act may be expended to support directly or indirectly combat activities in or over Cambodia, Laos, North Vietnam and South Vietnam or off the shores of Cambodia, Laos, North Vietnam and South Vietnam by United States forces, *and after August 15, 1973, no other funds heretofore appropriated under any other Act may be expended for such purpose.* (emphasis supplied).

Pub.L. 93–50, 93d Cong., 1st Sess.

■ The legal significance of these congressional actions is a matter for judicial determination. In undertaking this task, we have in mind certain basic axioms of statutory construction. First, courts should construe all legislative enactments so as to give them some meaning. Rosado v. Wyman, 397 U.S. 397, 415, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970). Second, when fairly possible such enactments should be construed so as to avoid a declaration of unconstitutionality. Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 348, 56 S. Ct. 466, 80 L.Ed. 688 (1936). Clearly the scope of these enactments is facially consistent with the powers ascribed to the Congress under the Constitution, and no suggestion to the contrary has been raised by either party.

■ It remains, therefore, to determine what Congress meant to do by passage of these bills. It is beyond debate that Congress intended all Cambodian military activity to cease after August 15, 1973. What is in debate is whether these provisions constituted a ratification of bombing in Cambodia until the August 15 deadline. We hold that, whether viewed as an authorization to bomb or as a limitation of existing authority impliedly granted by other congressional action, the July 1 enactments constitute a ratification of Cambodian bombing such as to demonstrate that the political branches are in concert as opposed to conflict. No reasonable interpretation exists for the stipulation of an August 15 cut-off date other than one which presumes that appropriation of funds for Cambodian military activity had been authorized by Congress. Viewed any other way these acts would be meaningless nullities. As has been pointed out, (Rosado v. Wyman, *supra*), the courts cannot make such a finding in the face of an alternate construction which has some meaning.

Plaintiffs' Supplemental Memorandum, at page 7, relies heavily on Justice Marshall's August 1 opinion which states that:

But while the issue is not wholly free from doubt, it seems relatively plain from the face of the statute that Congress directed its attention solely to military actions after August 15, *while expressing no view on the propriety of on-going operations prior to that date.* (emphasis supplied). Holtzman v. Schlesinger, Slip opinion, p. 9 n. 13.

We must respectfully disagree. Such contention does not give sufficient consideration to the fact that on July 1, 1973, not one but two legislative acts were signed into law. In its limitation of combat activities, Section 307 of the Supplemental Appropriations Act for Fiscal 1973 on its face draws a clear distinction between funds "herein appropriated" and funds "heretofore appropriated." The only limitation on the latter category is that such funds may not continue to be expended after August 15. This language is in sharp contrast to the more general and encompassing statement contained in Section 108 of the Joint Resolution Making Continuing Appropriation for Fiscal 1974.

The enactments of July 1, 1973, therefore, compel the conclusion that, although prior to that date the branches were divided and in disagreement, they were not in resolute conflict. Through the legitimate and essential employment of debate and compromise, there was achieved a "joint concord" between the executive and Congress which precludes the judiciary from interfering. Massachusetts v. Laird, 451 F.2d 26, 33 (1st Cir. 1971).

It is clear from the extensive debate and discussion that took place in both branches that these enactments reflected a negotiated compromise in position on the part of both branches. Minority Leader Gerald Ford stated:

> I have communicated directly with the spokesman at the White House last night and again today, and I am authorized to say the following: No. 1, the President will definitely accept and sign a bill that contains the language in section 307. No. 2—If military action is required in Southeast Asia after August 15, the President will ask congressional authority and will abide by the decision that is made by the House and the Senate, the Congress of the United States.

119 Cong.Rec.H. 5663 (daily ed. June 29, 1973).

> [I] just finished talking with the President himself for approximately 10 minutes, and he assured me personally that everything I said on the floor of the House is a committment by him.

119 Cong.Rec.H. 5669 (daily ed. June 29, 1973).

On the Senate side, Minority Leader Scott "acted as a conduit from the White House".

119 Cong.Rec.S. 12561 (daily ed. June 29, 1973).

Senator Fulbright described the legislation as "the result of an accommodation of the views of the committee and the White House following a meeting this morning. . . . [I]t now appears that the executive and legislative branches will, at last, act in a coordinate manner to bring to a close this tragic episode in our Nation's history." 119 Cong.Rec.S. 12560 (daily ed. June 29, 1973).

A reading of the Congressional Record makes it apparent that Congress acted with full awareness of its prerogatives and alternatives. For example, both Senators Hartke and Mondale suggested to their colleagues that "this Government ought to be brought to a grinding halt" by refusing to increase the debt ceiling and thus withhold funds for the operation of government. 119 Cong.Rec.S. 12568, S. 12578 (daily ed. June 29, 1973). Congressman Moss noted:

> It is not the first time that the President and Congress have disagreed. I recall one time where we took a bill back to President Eisenhower in almost identical form three times. Twice it was vetoed and the third time it was signed into law.
>
> This is a time when we should consider carefully the veto message and then send back our strong and our loud voice, "Mr. President, we do not concur."

*Ibid.*, H. 5676.

But in an effort to do what they deemed to be in the best interests of the country, the executive and the Congress chose the road of compromise and rejected that of confrontation. As Congressman Heinz pointed out:

> [W]e are at a legislative impass that might be broken in one of two ways. The first is for the House to seek a way of resolving the impass by taking a different road to achieve its objective. The second possibility the permutations and outcome of which are unclear, is confrontation. This would be achieved by continued congressional insistence on an immediate halt to military action in Laos and Cambodia, followed by Presidential vetoes. I can imagine the continuation of this scenario at least through July 15, at which point it is possible, although not cer-

tain, that a Government financial crisis would force capitulation of the President. 119 Cong.Rec.H. 5675 (daily ed. June 29, 1973).

The predominant spirit of the Congressional Record in this regard is reflected by the remarks of Congressman Robison of New York:

[L]et us have done with arguments over who is right and who is wrong on this issue . . . the paramount need—the overriding issue—is now that of insuring the continuity of the Government in and for this Nation.

\* \* \* \* \* \*

I long ago learned, here, that as wiser heads than mine have noted, "Politics is the art of the possible." Put another way, the older I get the more clearly I understand the fact that life, itself, is a succession of "tradeoffs"—of compromise, in one fashion or another, not with one's basic principles but of a sort designed to achieve one's basic purposes. Nowhere does that lesson become·clearer than here, in the Halls of Congress.

119 Cong.Rec.H. 5679 (daily ed. June 29, 1973).

 We reject any contention that the August 15 compromise was not a free will initiative of the Congress because of "coercion" imposed by the announced veto policy of the President. Such a contention would require us to presume an abdication of responsibility by the Congress. The extensive debate set forth in the Congressional Record demonstrates such a presumption to be untenable. To the contrary, the Record indicates congressional recognition and acceptance of its responsibility and a decision to meet such responsibility by the adoption of a policy course that is beyond the scope of judicial review.

The Record demonstrates clearly that, when faced with the issue before them, the legislators in both houses of Congress were fully aware of their responsibilities—mindful of their available alternatives—and sensitive to the likely consequences that would result from choosing a given course of action. The Record indicates strong and divergent views with respect to these matters, views that were forcefully articulated. In the end those on both sides of the issue determined that Government cannot function in the hands of unyielding wooden men. There was recognition that for Government to work there must be, in addition to a free and frank exchange of ideas and views, a willingness to accept the will of the majority as the proper course of action. This is the great strength of the Congress. To suggest that Congress acted other than under its free will is to ignore that great strength.

Congress is far from impotent in the face of executive veto. As Judge Dooling has written:

[I]t is idle to suggest that the Congress is so little ingenious or so inappreciative of its powers, including the power of impeachment, that it cannot seize policy and action initiatives at will, and halt courses of action from which it wishes the national power to be withdrawn. Orlando v. Laird, 317 F.Supp. 1013, 1019 (E.D.N.Y.1970), affm'd 443 F.2d 1039 (2d Cir. 1971), cert. denied 404 U.S. 869, 92 S.Ct. 94, 30 L.Ed.2d 113 (1971).

And as Chief Judge Coffin expressed it:

[W]hen the executive and Congress disagree not as to the advisability of fighting a war but as to the appropriate level of fighting, how shall the Constitution be served? When the executive takes a strong hand, Congress has no lack of corrective power. Congress has the power to tax, to appropriate, to impound, to override a veto. The executive has only the inherent power to propose and to implement, and the formal power to veto. The objective of the drafters of the Constitution was to give each branch "constitutional arms for its own de-

fense". The Federalist No. 23, at 476 (Mod.Lib.ed.) (Hamilton). But the advantage was given the Congress, Hamilton noting the "superior weight and influence of the legislative body in a free government, and the hazard to the Executive in a trial of strength with that body." *Id.*, at 478.

Massachusetts v. Laird, 451 F.2d 26, 34 (1st Cir. 1971).

In choosing the compromise alternative, Congress was alerted to the fact that the July 1 enactments could and would be interpreted as congressional authorization of bombing until August 15, 1973. Congressman Drinan, a plaintiff in this action, characterized the bill as ". . . a license to bomb for 45 more days . . .." 119 Cong.Rec.H. 5681 (daily ed. June 29, 1973). Congresswoman Abzug warned her colleagues that approval of the compromise would be approval of the war in Cambodia. *Ibid.*, H. 5681. Congresswoman Holtzman recognized that if the House voted "to allow [the President] to continue the bombing, we are doing nothing more than putting our imprimatur on the blood which he is spilling in Cambodia." *Ibid.*, H. 5684. Congressman Reuss stated that the compromise would constitute ratification of the bombing until August 15. *Ibid.*, H. 5679. Representative Moss noted the amendment would sanction the continuation of the war for six more weeks. *Ibid.*, H. 5676–77. See also Remarks of Congressman Eckhardt, *ibid.*, H. 5673; Congressman Findley, *ibid.* H. 5671; Congressman Edwards, *ibid.*, H. 5670; Congressman Giaimo, *ibid.*, H. 5668; Congressman Addabbo, *ibid.*, H. 5668.

The Senate was similarly aware of the legal effects of the compromise. Despite the opinion of Senator Fulbright to the contrary, see 119 Cong.Rec.S. 12560 (daily ed. June 29, 1973), Senators Eagleton, Mansfield, Hatfield, Kennedy and Muskie warned their fellow senators that the compromise would constitute congressional approval of the bombing until August 15. *Ibid.*, S.

12562, 12563, 12564, 12572 (daily ed. June 29, 1973). Senator Hartke described the compromise as "our first declaration of war since Pearl Harbor." *Ibid.*, S. 12578.

While the legal views of these legislators, of course, are not binding on the court, they are significant in their demonstration that Congress was fully aware of the potential legal consequences as it selected a course of action.

The Record indicates that, as is true in all cases of congressional action, the various legislators were motivated by a variety of factors. The debate affords us a view as to their motives. But congressional motivation is of historical and not legal significance. Congressional motivation does not affect the legal consequences of congressional action.

> Such evidence . . . could only disclose the motive and could not disprove the fact of authorization.

Orlando v. Laird, 317 F.Supp. 1013, 1019 (E.D.N.Y.1970), affm'd 443 F.2d 1039 (2d Cir. 1971), cert. denied 404 U.S. 869, 92 S.Ct. 94, 30 L.Ed.2d 113.

The attitude of the branches was cogently characterized by Senator Fulbright:

> In reaching agreement upon the terms of this amendment, both the executive branch and the committee receded in part from positions which had been strongly held over a number of years.

119 Cong.Rec.S. 12560 (daily ed. June 29, 1973).

By any objective standard it is clear that, after weeks of continuing debate and division, the executive and legislative have acted so as to avoid resolute conflict. The political question has been resolved by the Political Branches and, therefore, there is no justiciable issue before this court.

It is ordered, therefore, that plaintiffs' motion for summary judgment is denied and defendants' motion to dismiss is granted.

APPENDIX

SIGNIFICANT EXECUTIVE AND CONGRESSIONAL ACTION FOLLOWING THE WITHDRAWAL OF TROOPS AND THE RETURN OF PRISONERS

On January 27, 1973, the Agreement on Ending the War and Restoring Peace in Vietnam was signed in Paris. On March 28, 1973, the last American combat troops were withdrawn from South Vietnam and on April 1, 1973, the last known American prisoners of war were released.

In his statements on "Presidential Authority to Continue U. S. Air Combat Operations in Cambodia", submitted to the Senate Committee on Foreign Relations, Secretary of State William Rogers stated that the presence of North Vietnamese troops in both Laos and Cambodia threatened the right of self-determination of the South Vietnamese people, which was guaranteed by the Paris Agreement, and that air strikes in Cambodia were thus intended to enforce compliance with the Vietnam peace agreement. Hearings on S. 1248 and H.R. 5610, 93d Cong., 1st Sess., at 453.

On May 10, 1973, the House voted down (219 to 188) a request (see 119 Cong.Rec.H. 3449) by the Department of Defense to transfer funds, about $175 million of which was earmarked for activities in Southeast Asia. 119 Cong. Rec.H. 3592 (daily ed. May 10, 1973).

The House then adopted (244 to 172) the Long Amendment to the Second Supplemental Appropriations Bill, H.R. 7447. 119 Cong.Rec.H. 3598 (daily ed. May 10, 1973). The amendment provided:

> None of the funds herein appropriated to the Department of Defense under this Act shall be expended to support directly or indirectly combat activities in, over or from off the shores of Cambodia by United States Forces.

*Ibid.*, H. 3593.

On May 31, 1973, the Senate adopted (63 to 19) the Eagleton Amendment.

119 Cong.Rec.S. 10128 (daily ed. May 31, 1973). Broader in scope than the Long Amendment, it provided:

> Sec. 305. None of the funds herein appropriated under this Act or heretofore appropriated under any other Act may be expended to support directly or indirectly combat activities in, over or from off the shores of Cambodia or in or over Laos by United States forces.

119 Cong.Rec.S. 9827 (daily ed. May 29, 1973).

After consideration by a conference committee of the two houses, the House voted (235 to 172) on June 25, 1973, to accept the Eagleton Amendment. 119 Cong.Rec.H. 5268 (daily ed. June 25, 1973). The House rejected (204 to 204) a proposal to delay the effect of the amendment. *Ibid.*, H. 5274.

On June 26, 1973, the Senate voted (81 to 11) favorably on the conference report containing the Eagleton Amendment. 119 Cong.Rec.S. 12057 (daily ed. June 26, 1973).

On June 26, 1973, the House adopted two anti-bombing amendments (the Long Amendment and the Addabbo Amendment) to the Continuing Appropriations Resolution. The Long Amendment, approved by a vote of 218 to 194, 119 Cong.Rec.H. 5371 (daily ed. June 26, 1973), provided:

> None of the funds under this joint resolution heretofore appropriated may be expended to support directly or indirectly combat activities in or over Cambodia or Laos or off the shores of Cambodia or Laos by United States forces.

*Ibid.*, H. 5363.

The Addabbo Amendment, approved 240 to 172, *ibid.*, H. 5373, provided:

> Sec. 108. None of the funds under this Joint Resolution may be expended to support directly or indirectly combat activities in or over Cambodia, Laos, Vietnam and South Vietnam or off the shores of Cambodia, Laos, North Vietnam and South Vietnam by

United States forces without the express consent of Congress.

*Ibid.*, H. 5361.

On June 27, 1973, President Nixon vetoed H.R. 7447, stating that he did so because of his grave concern that the "Cambodia rider" contained in the bill "would cripple or destroy the chances for an effective negotiated settlement in Cambodia . . . ." See 119 Cong. Rec.H. 5486 (daily ed. June 27, 1973).

The House failed to override the veto, voting 241 to 173 (35 votes short of the required ⅔ vote). 119 Cong.Rec.H. 5487 (daily ed. June 27, 1973).

The Senate voted (67 to 29) on June 27 to attach the Eagleton Amendment to H.R. 8410, the debt limit bill. 119 Cong.Rec.S. 12173 (daily ed. June 27, 1973). The Amendment provided:

> Sec. 501. No funds heretofore or hereafter appropriated under any Act of Congress may be obligated or expended to support directly or indirectly combat activities in, over, or from off the shores of Cambodia or in or over Laos by United States forces.

*Ibid.*, S. 12171.

The bill with the Eagleton Amendment was then passed (72 to 19) by the Senate. *Ibid.*, S. 12220.

On June 29, 1973, aware of the President's position concerning "Cambodia riders," and faced with the critical need for funding the operation of the federal government, Senator Fulbright, after meeting with White House representatives, proposed the following amendment to the Continuing Appropriations Resolution:

> Sec. 109. Notwithstanding any other provision of law, on or after August 15, 1973, no funds herein, heretofore or hereafter appropriated may be obligated or expended to finance the involvement of United States military forces in hostilities in or over or from

off the shores of North Vietnam, South Vietnam, Laos, or Cambodia. 119 Cong.Rec.S. 12560 (daily ed. June 29, 1973). The Senate approved the amendment (64 to 26), *ibid.*, S. 12580, and withdrew the Eagleton Amendment. *Ibid.*, S. 12581.

In conference of both houses the wording was changed, see 119 Cong.Rec.H. 5777 et seq. (daily ed. June 30, 1973), the conference report was approved by the House, *ibid.* H. 5781, and the Joint Resolution Making Continuing Appropriation for Fiscal 1974 became law on July 1, 1973, with the President's signature. It provided in pertinent part:

> Sec. 108. Notwithstanding any other provision of law, on or after August 15, 1973, no funds herein or heretofore appropriated may be obligated or expended to finance directly or indirectly combat activities by United States military forces in or over or from off the shores of North Vietnam, South Vietnam, Laos or Cambodia.

P.L. 93–52, 93d Cong., 1st Sess.

In a similar move toward compromise, and after assurances from Minority Leader Gerald Ford that the President would approve the bill, the House on June 29 passed Sec. 307 (278 to 124), 119 Cong. Rec.H. 5687 (daily ed. June 29, 1973) which was signed into law on July 1, as part of the Supplemental Appropriations Act for Fiscal 1973. It provided:

> Sec. 307. None of the funds herein appropriated under this Act may be expended to support directly or indirectly combat acvtivities in or over Cambodia, Laos, North Vietnam and South Vietnam or off the shores of Cambodia, Laos, North Vietnam and South Vietnam by United States forces, and after August 15, 1973, no other funds heretofore appropriated under any other Act may be expended for such purpose.

Pub.L. 93–50, 93d Cong., 1st Sess.